James COLEMAN, Jr., et al.,
Plaintiffs-Appellants,

v.

The UNITED STATES of America,
BUREAU OF INDIAN AFFAIRS,
Defendant-Appellee.

No. 82–2630.

United States Court of Appeals,
Seventh Circuit.

Argued June 10, 1983.

Decided Aug. 19, 1983.

As Amended Aug. 23, 1983.

Rehearing Denied Oct. 14, 1983.

Robert L. Schroeder, Emory Andrew Tate & Associates, Chicago, Ill., for plaintiffs-appellants.

Ellen J. Durkee, Appellate Section, Land Div., Dept. of Justice, Washington, D.C., for defendant-appellee.

Before PELL and BAUER, Circuit Judges, and DUMBAULD,* Senior U.S. District Judge.

DUMBAULD, Senior U.S. District Judge.

Plaintiffs-appellants are descendants of Creek Indians. They allege breach by the United States of its trusteeship of Indian lands held for the Creek nation. Most of the land (2,997,114 acres) was distributed to individual Creeks (and freedmen, of mixed blood, partly Creek). Appellants' ancestors duly received their allotments. Appellants' alleged grievance relates to disposition of 65,965 acres which were not allotted to individuals. Of these 65,805 have subsequently been sold, and appellants claim that inadequate consideration was received. It is also alleged that the United States permitted the State of Oklahoma to obtain Creek land without compensation, and that by improperly increasing the number of persons enrolled in the Creek tribe and making allotments to them the United States dissipated the surplus land.

Whether the District Court for the Northern District of Illinois has jurisdiction to consider the merits of these alleged breaches of trust and to award appellants an accounting in the form of pecuniary damages is the question at issue in the case at bar. The District Court, 546 F.Supp. 515, held that it did not have jurisdiction. We affirm, for reasons hereinafter elaborated. To explain the questions involved will necessitate learning "more than you ever wanted to know," as the little girl said of some other subject, about American Indians and their tribal lands.[1]

Government policy towards Indians and applicable legal enactments have been subject to many fluctuations over the course of time. The Declaration of Independence speaks of "the merciless Indian savages, whose known Rule of Warfare, is an undistinguished Destruction, of all Ages, Sexes and Conditions." The frontier inhabitants of Western Pennsylvania deemed themselves aggrieved by the parsimonious unwillingness of Quaker merchants in Philadelphia to pay taxes sufficient for effective defense against Indian incursions. In his *Notes on the State of Virginia,* Thomas Jefferson referred to the detrimental effect on the Indians of spirituous liquors, pox, and diminution of available land to "a people who live principally on the spontaneous productions of nature."[2] War and hunting occupied the men of the tribe; domestic drudgery was the lot of the women.[3] However, Jefferson noted, "That the lands of this country were taken from them by conquest, is not so general a truth as is supposed."[4] Voluntary sales largely accounted for the contraction of tribal territory.

The Constitution framed in 1787 at Philadelphia empowered the federal government to "regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes."[5] As stated by Chief Justice John Marshall in *Worcester v. Georgia,* 6 Pet. 515, 559, 8 L.Ed. 483 (1832): "That instrument confers on congress the

---

* The Honorable Edward Dumbauld, Senior U.S. District Judge, of the Western District of Pennsylvania, sitting by designation.

1. In the discussion which follows useful information has been derived from Felix Cohen's monumental *Handbook of Indian Law* (University of New Mexico Press 1971 reprint of the original 1942 edition), hereinafter cited as "Cohen," and from "Federal Plenary Power in Indian Affairs after *Weeks* and *Sioux Nation,*" 131 U. of Pa.L.R. (November, 1982) 235–70, hereinafter cited as "Plenary Power;" Reid Peyton Chambers, "Judicial Enforcement of the Federal Trust Responsibility to Indians," 27 Stanford L.R. (May, 1975) 1213–48; and Gail M. Lambert, "Judicial Breach of Trust Suits: Partial Justice in the Court of the Conqueror," 33 Rutgers L.R. (Winter, 1981) 502–537. See also Felix Cohen, "Indian Rights and the Federal Courts" 24 Minn.L.R. (January, 1940) 145–200; and Cohen, "The Erosion of Indian Rights, 1950–1953: A Case Study in Bureaucracy," 62 Yale L.J. (February, 1953) 348–90.

2. Jefferson, *Notes on the State of Virginia* (London, 1787) 153.

3. *Ibid.,* 100–101.

4. *Ibid.,* 153.

5. Art. I, sec. 8, cl. 3.

powers of war and peace; of making treaties, and of regulating commerce with foreign nations, and among the several states, and with the Indian tribes. These powers comprehend all that is required for the regulation of our intercourse with the Indians." The Indian nations were "considered as distinct, independent, political communities" and "capable of making treaties." Marshall concluded: "The treaties and laws of the United States contemplate the Indian territory as completely separated from that of the states; and provide that all intercourse with them shall be carried on exclusively by the government of the Union."[6] Hence, Georgia could not constitutionally subject Worcester to imprisonment for four years at hard labor for preaching the Gospel to the Cherokee Indians under the authority of the President of the United States.[7] This decision was the occasion for the remark allegedly made by President Andrew Jackson: "Well, John Marshall has made his decision, now let him enforce it."[8]

In this case Marshall applied the doctrine of title by discovery, giving to the European nation first settling an American colony the right of pre-emption, "the exclusive right of purchasing such lands as the natives were willing to sell."[9]

This principle had been formulated in *Johnson and Graham's Lessee v. McIntosh*, 8 Wheat. 543, 574, 5 L.Ed. 681 (1823), where it was held that a title granted by Indian tribes themselves in 1773 and 1775, without the intervention of the American government, was invalid. The court held that the Indians had a right to occupy the lands which they inhabited, "but their rights to complete sovereignty, as independent nations, were necessarily diminished, and their power to dispose of the soil, at their own will, to whomsoever they pleased, was de-

nied by the original fundamental principle, that discovery gave exclusive title to those who made it." The European nations "asserted the ultimate dominion to be in themselves and claimed and exercised, as a consequence of this ultimate dominion, a power to grant the soil, while yet in the possession of the natives. These grants have been understood by all, to convey a title to the grantees, subject only to the Indian right of occupancy."[10]

Insofar as the native Indians were concerned, Marshall explains: "The potentates of the old world found no difficulty in convincing themselves, that they made ample compensation to the inhabitants of the new, by bestowing on them civilization and Christianity, in exchange for unlimited independence."[11]

The Indian tribes within the acknowledged boundaries of the United States, Marshall declared in *Cherokee Nation v. Georgia*, 5 Pet. 1, 17, 8 L.Ed. 25 (1831), are not "foreign States" entitled to bring suit under Article III, sec. 2, cl. 1 of the Constitution. "They may, more correctly, perhaps, be denominated domestic dependent nations. They occupy a territory to which we assert a title independent of their will, which must take effect in point of possession, when their right of possession ceases. Meanwhile, they are in a state of pupilage; their relation to the United States resembles that of a ward to his guardian."

In the course of the nation's westward expansion and "Manifest Destiny," the pressures on Indians to surrender their lands and to emigrate to reservations established for them in more remote regions became stronger.[12] Emphasis was also placed on Marshall's view of the Indians as "wards" of the government rather than on

---

**6.** 6 Pet. at 557.

**7.** *Ibid.,* 6 Pet. at 561–62.

**8.** Charles Warren, *The Supreme Court in United States History* (1922) II, 219.

**9.** 6 Pet. at 543–45.

**10.** *Ibid.,* 8 Wheat. at 574.

**11.** *Ibid.,* 8 Wheat. at 573.

**12.** The Act of May 28, 1830, 4 Stat. 411, encouraged exchange of existing Indian reservations for new ones to be established west of the Mississippi river. Under President Andrew Jackson the methods of procuring voluntary emigration became more coercive. Cohen, 13. The Cherokees were forced to tread "the trail of tears." See "The State of Cherokee," 55 Am.Bar. Assn.J. (April, 1969) 339, 340, and Chambers, *loc. cit.* note 1 *supra,* 1223. See also Cohen, 53–62.

his recognition of their autonomy and right to self-government as "distinct, independent, political communities." [13] In 1871 the practice of negotiating treaties with the Indians was abandoned.[14]

The concept of "wardship" or "trusteeship" did not result in strict application by analogy of technical rules such as those expounded in Scott on Trusts. *U.S. v. Mitchell,* 445 U.S. 535, 542–44, 100 S.Ct. 1349, 1353–54, 63 L.Ed.2d 607 (1980); *U.S. v. Mitchell,* —— U.S. ——, —— – ——, 103 S.Ct. 2961, 2972, 77 L.Ed.2d 580 (1983). Rather it came to signify a "plenary authority" or suzerain power over Indian affairs, sometimes presenting non-justiciable "political questions." Chambers, *loc. cit.* note 1, *supra,* 1223; *Cherokee Nation v. Hitchcock,* 187 U.S. 294, 305–308, 23 S.Ct. 115, 119–120, 47 L.Ed. 183 (1902); *Lone Wolf v. Hitchcock,* 187 U.S. 553, 564–68, 23 S.Ct. 216, 220–22, 47 L.Ed. 299 (1903); *U.S. v. Kagama,* 118 U.S. 375, 382–85, 6 S.Ct. 1109, 1113–14, 30 L.Ed. 228 (1886); *Gritts v. Fisher,* 224 U.S. 640, 648, 32 S.Ct. 580, 583, 56 L.Ed. 928 (1912); *Shoshone Indians v. U.S.,* 324 U.S. 335, 354–58, 65 S.Ct. 690, 699–701, 89 L.Ed. 985 (1945) [Jackson, J. concurring]; *U.S. v. Alcea Band of Tillamooks,* 329 U.S. 40, 45–47, 67 S.Ct. 167, 169–170, 91 L.Ed. 29 (1946) [argued for the Government by Chief Judge Walter J. Cummings, Jr.]. Cf. *Tee-Hit-Ton Indians v. U.S.,* 348 U.S. 272, 284–85, 75 S.Ct. 313, 319–20, 99 L.Ed. 314 (1955). When carried too far, however, the concept evoked Cardozo's apothegm that an act of confiscation is not an exercise of guardianship and that "Spoliation is not management." *Shoshone Tribe v. U.S.,* 299 U.S. 476, 498, 57 S.Ct. 244, 252, 81 L.Ed. 360 (1937); see also *U.S. v. Creek Nation,* 295 U.S. 103, 110, 55 S.Ct. 681, 684, 79 L.Ed. 1331 (1935).

A policy of assimilation, rather than of preservation of ethnic heritage and tribal customs, came to the fore. As expressed in 1889 by Indian Commissioner Thomas J. Morgan: "The Indians must conform to 'the white man's way,' peaceably if they will, forcibly if they must. They must adjust themselves to their environment, and conform their mode of living substantially to our civilization.... They cannot escape it, and must either conform to it or be crushed by it ... The tribal relations should be broken up, socialism destroyed, and the family and the autonomy of the individual substituted. The allotment of lands in severalty, the establishment of local courts and police, the development of a personal sense of independence, and the universal adoption of the English language, are means to this end.... The American Indian is to become the Indian American." [15]

In keeping with this philosophy Congress had in 1887 adopted an act (commonly called the General Allotment Act, or the Dawes Act, for Senator Henry L. Dawes of Massachusetts) providing for the allotment of Indian lands to individual Indians as their separate property.[16] The patents issued to allottees provided that the land so allotted would be held in trust for the allottee or his heirs for 25 years (or longer if the President extends the period). Any attempted alienation before the expiration of such period is declared void. Section 2 of the Wheeler-Howard Indian Reorganization Act of June 18, 1934, 48 Stat. 984, extended indefinitely "the existing periods of trust" and restrictions on alienation. Any surplus land not allotted may be acquired by the United States and sold to homesteaders.[17] Citizenship was conferred on allottees and

---

**13.** Cohen, 17.

**14.** The Act of March 3, 1871, 16 Stat. 544, 566, contained a provision "That hereafter no Indian nation or tribe within the territory of the United States shall be acknowledged or recognized as an independent nation, tribe, or power with whom the United States may contract by treaty: *Provided, further,* that nothing herein contained shall be construed to invalidate or impair the obligation of any treaty heretofore lawfully made and ratified with any such Indian

nation or tribe." Thereafter, agreements approved by both houses of Congress were used instead of treaties. Cohen, 66; "Plenary Power," 245.

**15.** Cohen, 23.

**16.** Act of February 8, 1887, 24 Stat. 388. On the allotment system see Cohen, 206–36.

**17.** 24 Stat. 389–90.

other Indians residing "separate and apart from any tribe" and "adopting the habits of civilized life." [18]  The Act did not apply to the Creeks.[19]

Shortly after the turn of the century, however, Congress did direct that Creek lands be allotted to members of the tribe. For this purpose the Act of March 1, 1901, 31 Stat. 861, and the Act of June 30, 1902, 32 Stat. 500 were passed, approving agreements between the tribe and the Dawes Commission to the Five Civilized Tribes.[20] The tribes, including the Creeks, had opposed the allotment system, but after passage, notwithstanding their bitter protests, of the Curtis Act of June 28, 1898, 30 Stat. 495, 502–503 (§ 21), directing enrollment of the members of the tribes, bowed to the inevitable.[21]  The standard allotment was 160 acres, at a minimum value of $6.50 per acre.[22]  An act to provide for the final disposition of the affairs of the Five Civilized Tribes was enacted on April 26, 1906, 34 Stat. 137.

The terms of the legislation applicable to the Creeks, upon which appellants base their arguments in the case at bar, will be examined later in greater detail, after completing the account of changes in Indian policy embodied in the vicissitudes of Congressional enactments.

A *volte-face* in Indian policy was embodied in the Wheeler-Howard Act of June 18, 1934, 48 Stat. 984.[23]  This legislation has been described as an "Indian New Deal." [24] Section 1 of the Act provided that "hereafter no land of any Indian reservation ... shall be allotted in severalty to any Indian." [25]  Section 3 authorized the Secretary of the Interior "to restore to tribal ownership the remaining surplus lands of any Indian reservation heretofore opened, or authorized to be opened, to public sale, or any other form of disposal...." [26]  Under the previously prevailing allotment policy the acreage of Indian lands had decreased 80% during the period 1887 to 1934 from 138,-000,000 acres to 48,000,000.[27]

The next policy actuating Congress was one of generosity and largesse.  This attitude was embodied in the Indian Claims Commission Act of August 13, 1946, 60 Stat. 1049.  This statute authorized, *inter alia*, the award of money damages (thus protecting present possessors of former tribal lands,) [28] for lands of which Indians had been deprived without agreed-upon compensation or by means other than "fair and honorable dealings." [29]  Astronomical awards and counsel fees ensued, perhaps constituting a model and inspiration for current class action practitioners.

18.  *Ibid.*, 390.

19.  *Ibid.*, 391.

20.  This expression refers to the Choctaw, Chickasaw, Cherokee, Creek, and Seminole tribes in Indian Territory.  Because of their advanced condition, there was never any organized Territorial Government set up in Indian Territory.  It was combined with Oklahoma Territory, to form the State of Oklahoma, admitted to the Union in 1907.  Cohen, 427–34. *For a thorough discussion of the efforts of* non-Indian settlers to obtain tribal lands of the Creeks, see Judge Bryant's opinion in *Harjo v. Kleppe,* 420 F.Supp. 1110, 1119–1124 (D.D.C. 1976).

21.  Cohen, 210, 425–34, 437–38.  Section 30 of the Curtis Act approved an earlier agreement of September 27, 1897, relating to allotment, negotiated between the Creeks and the Dawes Commission.  This agreement provided for an allotment of 160 acres, at a minimum valuation of $1.25 per acre.  30 Stat. 514.

22.  31 Stat. 862.

23.  Cohen, 84–87, 103.

24.  "Plenary Power," 236.

25.  48 Stat. 984; Cohen, 217.

26.  48 Stat. 984, Cohen, 103.

27.  Cohen, 216; "Plenary Power," 235.  But between March, 1933, and December, 1937, Indian land holdings increased by 2,780,000 acres. Cohen, 86.

28.  Lambert, *loc. cit.* note 1 *supra*, 516.  There was a five-year statute of limitation for claims accruing before August 13, 1946.  During the five year period 370 petitions were filed, covering 850 claims.  *Ibid.*, 518.

29.  Section 2 of the Act, 60 Stat. 1050.  A narrower jurisdiction for Indian claims after August 13, 1946, was conferred upon the Court of Claims by Section 24 of the Act, 60 Stat. 1055.

Congress next reverted towards the old policy of assimilation [30] when "termination" of tribal existence and of federal control over Indian affairs was the prevailing program.[31]

A disastrous illustration of this policy is afforded by the Menominee Termination Act of June 17, 1954, 68 Stat. 250 discussed in *Menominee Tribe of Indians v. U.S.,* 607 F.2d 1335, 221 Ct.Cl. 506 (1979). By the Act of December 22, 1973, 87 Stat. 770, the Menominees were restored to tribal status.[32] "The current federal policy is to support the 'self-determination' of the tribes, an express repudiation of the disastrous termination policy." [33]

From the foregoing review of the vicissitudes and tergiversations of federal Indian policy, it will be clear that numerous difficult questions would require determination by the District Court if it had jurisdiction of appellants' complaint. There would be serious questions regarding the scope of rights vested collectively in the tribe (as to which individual plaintiffs would have no standing); [34] regarding the legal scope and enforceability of the metaphorical concepts of "guardianship," "trusteeship," and "plenary power" in federal Indian law; [35] and regarding inheritance of rights vested in plaintiffs' ancestors.[36] If the District Court is correct in holding that it has no jurisdiction, the case at bar is an inappropriate vehicle for resolving these difficult problems.

We therefore proceed to scrutinize with care the jurisdictional statutes invoked by appellants. These are 28 U.S.C. 1331; 28 U.S.C. 1346; and 28 U.S.C. 1353.

■ Section 1331 is the general federal question provision giving jurisdiction of civil actions "arising under" the Constitution, laws, or treaties of the United States. The boundaries of that concept are set forth by Justice Cardozo in *Gully v. First National Bank,* 299 U.S. 109, 112–14, 57 S.Ct. 96, 97–98, 81 L.Ed. 70 (1936), cited by the District Court. That test requires a genuine and present controversy shown in the complaint, invoking a right or immunity such that it will be supported if one construction of the law is accepted and defeated if another construction is followed. The *Gully* rule was recently reaffirmed in *Franchise Tax Bd. v. Laborers Vacation Trust,* —— U.S. ——, —— ——, 103 S.Ct. 2841, 2848, 77 L.Ed.2d 420.

■ Even if appellants succeeded in formulating a grievance which could be brought within the scope of the "arising under" requirements of *Gully* and similar cases, they would have accomplished nothing unless they could also establish that Congress had waived sovereign immunity and consented to suit against the United States with respect to the particular controversy at issue.

■ It is elementary that when consent to sue the United States is granted, the precise terms, conditions, and qualifications of such consent must be scrupulously followed. *U.S. v. Sherwood,* 312 U.S. 584, 586–87, 61 S.Ct. 767, 769–70, 85 L.Ed. 1058 (1941). Thus Congress may prescribe a particular procedure to be followed, or a particular tribunal to be invoked, or a particular remedy to be pursued.[37]

---

**30.** "Assimilation, allotment, and citizenship" had been the watchwords of Indian administration in the post-civil war era. Cohen, 66.

**31.** "A federal policy of termination was in effect from 1945 to 1961." Lambert, *loc. cit.* note 1 *supra,* 503. "Plenary Power," 236, gives 1953 as the date the policy of termination emerged.

**32.** "Plenary Power," 236.

**33.** *Ibid.,* 236. "Termination has now been disavowed as a goal of federal Indian policy." Chambers, *loc. cit.* note 1 *supra,* 1226. See the "Indian Self-Determination and Education Assistance Act" of January 4, 1975, 88 Stat. 2203.

**34.** See Cohen, 133–37 (chapter 7, section 4, "The Power to Determine Tribal Member-

ship"); 139–41 (chapter 7, section 6, "Tribal Control of Descent and Distribution"); 143–45 (chapter 7, section 8, "Tribal Powers over Property"); 183–94 (chapter 9, "Individual Rights in Tribal Property"); 289–347 (chapter 15, "Tribal Property").

**35.** See authorities cited in note 1, *supra.*

**36.** Cohen, 229–36 (chapter 11, section 6, "Descent and Distribution of Allotted Lands.").

**37.** Thus the Indian Claims Settlement Act of 1948 afforded only money damages and established a special tribunal to adjudicate claims. See note 28, *supra.* The Federal Tort Claims Act of August 2, 1946, 60 Stat. 842, 843–44,

Hence it is fatal to appellants' attempt to invoke the jurisdiction of the District Court in the case at bar that section 26 of the Act of March 1, 1901, 31 Stat. 869, a statute upon which appellants rely as the purported basis of their substantive rights, provides a special procedure for processing claims which excludes the general grant of district court jurisdiction in § 1331. Section 26 makes clear that:

> All claims of whatsoever nature, ... which the tribe *or any individual thereof* may have against the United States ... shall be submitted to the Senate of the United States for determination; ... (Italics supplied) [38]

Section 26 goes on to state that:

> Any other claim which the *Creek Nation* may have against the United States may be prosecuted in the Court of Claims of the United States, with right of appeal to the Supreme Court, and jurisdiction to try and determine such claim is hereby conferred upon said courts. (Italics supplied).

For individuals, such as appellants, as distinguished from the Creek tribe, the exclusive remedy was recourse to the Senate, promptly after ratification of the agreement.

Section 24 of the Indian Claims Commission Act of August 13, 1946, 60 Stat. 1055, extended the jurisdiction of the Court of Claims to "any claim against the United States occurring after the date of the approval of this Act in favor of any Indian tribe, band, *or other identifiable group* of American Indians residing within the territorial limits of the United States or Alaska whenever such claim is one arising under the Constitution, laws, treaties of the United States, or Executive orders of the President, or is one which otherwise would be cognizable in the Court of Claims, if the claimant were not an Indian tribe, band, or group." (Italics supplied).

If appellants may be regarded as an "identifiable group of American Indians" and if their claim accrued after August 13, 1946, they could proceed in the Court of Claims.[39]

■ Equally fatal to the exercise of jurisdiction in the case at bar is the magnitude of appellants' claim. Their complaint expressly alleges that the amount in controversy exceeds $10,000 and includes extensive but unspecified money damages with interest from the year 1902.

But 28 U.S.C. 1346(a)(2) (the second jurisdictional provision cited by appellants) expressly limits the jurisdiction of district courts (concurrent with the Court of Claims) to claims "not exceeding $10,000 in amount."

■ Likewise unavailing is appellants' reliance on 28 U.S.C. 1353. That section confers jurisdiction of civil actions "involving the right of any person, in whole or in part of Indian blood or descent, to any allotment of land under any Act of Congress or treaty."

But appellants are not seeking an allotment. Their ancestors duly received their allotments. What appellants seek is money damages for alleged breach of trust in the management of surplus, unallotted lands. 28 U.S.C. 1353 affords no basis for District Court jurisdiction of the case at bar.

It is conceivable that appellants might have developed an ingenious claim for an allotment (though they have not done so) by arguing that section 3 of the Act of March 1, 1901, 31 Stat. 862 should be construed as requiring equality among all members of the tribe: "*All lands of said tribe ... shall be allotted ... so as to give each an equal share of the whole in value,* as nearly as

---

provided for jurisdiction in district courts but prohibited trial by jury.

**38.** Such determination must be made within two years of ratification of the agreement between the Creeks and the Dawes Commission.

**39.** Before the Act of August 13, 1946, Indian claims were expressly excluded from the juris-

diction of the Court of Claims by § 9 of the Act of March 3, 1863, 12 Stat. 767. The Claims Court (a non-Article III court) is now the successor forum to the Court of Claims, an Article III court, which was abolished by the Act of April 2, 1982, 96 Stat. 25.

may be, in manner following." (Italics supplied). In other words, if the initial allotment of 160 acres to each member did not exhaust the available land, perhaps appellants' ancestors would have been entitled to a supplemental allotment, and appellants as successors in interest to their ancestors may now be entitled to pursue a claim for such additional land.

However, this speculative right of action would seem to be foreclosed by section 23 of the Act, providing that any allottee accepting a deed to his allotment (*lege* appellants' ancestors) "shall be deemed to assent to the allotment and conveyance of all lands of the tribe, as provided herein and as a relinquishment of all his right, title, and interest in and to the same, except in the proceeds of lands reserved from allotment"[40] (31 Stat. 868).

Moreover, 28 U.S.C. 1353 appears to be inapplicable to lands held by the Creeks (one of the Five Civilized Tribes) on or before December 21, 1911. Although the trumpet gives a somewhat uncertain sound, the record seems to indicate that the claims in the case at bar relate to land held by the Creeks in 1901 or 1902, thus before 1911.

28 U.S.C. 1353 reads in full:

The district courts shall have original jurisdiction of any civil action involving the right of any person, in whole or in part of Indian blood or descent, to any allotment of land under any Act of Congress or treaty.

The judgment in favor of any claimant to an allotment of land shall have the same effect, when properly certified to the Secretary of the Interior, as if such allotment had been allowed and approved by him; but this provision shall not apply to any lands held on or before December 21, 1911, by either of the Five Civilized Tribes, the Osage nation of Indians, nor to any of the lands within the Quapaw Indian Agency.

The somewhat ambiguous language of the latter part of the section is derived from the Act of August 15, 1894, 28 Stat.

305 (now codified as 25 U.S.C. 345) which was re-enacted by the Act of February 6, 1901, 31 Stat. 760, shortly before the familiar Act of March 1, 1901, relating to the Creek allotments referred to in the case at bar. The entire passage in the Act of 1894 reads as follows:

That all persons who are in whole or in part of Indian blood or descent who are entitled to an allotment of land under any law of Congress, or who claim to be so entitled to land under any allotment Act or under any grant made by Congress, or who claim to have been unlawfully denied or excluded from any allotment or any parcel of land to which they claim to be lawfully entitled by virtue of any Act of Congress, may commence and prosecute or defend any action, suit, or proceeding in relation to their right thereto, in the proper circuit court of the United States. And said circuit courts are hereby given jurisdiction to try and determine any action, suit, or proceeding arising within their respective jurisdictions, involving the right of any person, in whole or in part of Indian blood or descent, to any allotment of land under any law or treaty. And the judgment or decree of any such court in favor of any claimant to an allotment of land shall have the same effect, when properly certified to the Secretary of the Interior, as if such allotment has been allowed and approved by him; but *this provision shall not apply to any lands now held by either of the Five Civilized Tribes* nor to any of the lands within the Quapaw Indian Agency: Provided, That the right of appeal shall be allowed to either party as in other cases. (Italics supplied).

The problem in construing this passage is whether the words "this provision" refer to the whole jurisdictional provision authorizing litigation of claims for allotment, or merely to the latter portion establishing the effect of a judgment as equivalent to an allotment voluntarily allowed and approved by the Secretary of the Interior himself. In

---

**40.** Section 24 authorized sale of reserved lands "when not needed for the purposes for which

they are at present used." (31 Stat. 869).

all probability the former is the correct interpretation, as there would be little reason to give different effect to judgments rendered before or after 1894 (or 1911). On the other hand, Congress might well choose to limit justiciability to claims for allotments in specific identifiable tracts of land owned by a tribe at a certain date. The language therefore should be interpreted to exclude jurisdiction in the case at bar over claims relating to land held by the Creeks before 1911.

Hence it seems clear that, whatever remedy appellants may have for their alleged grievances, they are not entitled to proceed with the present action in the District Court of the Northern District of Illinois, and the judgment of that court, dismissing the case for lack of jurisdiction must be, and hereby is,

AFFIRMED.