## UNITED STATES *v.* CREEK NATION.

No. 2. Argued October 8, 1934.—Decided April 29, 1935.

*Assistant Attorney General Sweeney,* with whom *Solicitor General Biggs, Assistant Attorney General Blair,* and *Messrs. George T. Stormont* and *Wilfred Hearn* were on the brief, for the United States.

*Mr. W. W. Spalding,* with whom *Messrs. E. J. Van Court* and *Paul M. Niebell* were on the brief, for respondent.

MR. JUSTICE VAN DEVANTER delivered the opinion of the Court.

This is a suit by the Creek Nation or Tribe of Indians against the United States to recover compensation for certain lands of that tribe charged to have been appropriated by the United States. The tribe obtained a judgment and we granted a petition by the United States for certiorari. The suit was brought in 1926 under the act of May 24, 1924, c. 181, 43 Stat. 139, which declares:

" That jurisdiction be, and is hereby, conferred upon the Court of Claims, notwithstanding the lapse of time or statutes of limitation, to hear, examine, and adjudicate and render judgment in any and all legal and equitable claims arising under or growing out of any treaty or agreement between the United States and the Creek Indian Nation or Tribe, or arising under or growing out of any Act of Congress in relation to Indian affairs, which said Creek Nation or Tribe may have against the United States, which claims have not heretofore been determined and adjudicated on their merits by the Court of Claims or the Supreme Court of the United States."

In the course of the suit the United States set up certain cross-demands and recovered judgment thereon; but the judgment on the tribe's claim is all that is challenged now.

The principal facts relating to that claim were conceded below, as shown by the court's opinion and findings, and stand unquestioned here.

Under a treaty of 1833 [1] the United States granted to the Creek Tribe, by a patent conveying a fee simple, a large tract of land in Indian Territory, now Oklahoma. By a treaty of 1866 [2] the Creeks ceded to the United States the westerly half of that tract, but expressly re-

---

[1] Treaty of February 14, 1833, Arts. 2 and 3, 7 Stat. 417.

[2] Treaty of June 14, 1866, Arts. 3 and 8, 14 Stat. 785, 786, 788.

tained the easterly half; and the United States stipulated it would cause a north and south line separating the ceded from the unceded lands to be surveyed under the direction of the Commissioner of Indian Affairs, and guaranteed to the Creeks quiet possession of their unceded lands.

In 1871 one Bardwell, acting under the direction of the Commissioner of Indian Affairs, surveyed the divisional line. A controversy soon arose as to whether the line was surveyed too far to the east, and thereby encroached on unceded lands of the Creeks; but that controversy, if not terminated before, was put to rest and the line effectively recognized by an agreement made between the Creek Tribe and the United States in 1889,[3] wherein the tribe's ownership of the lands east of that line was expressly recognized.

In 1867[4] the United States entered into a treaty with the Sac and Fox Indians under which it assigned to them a tract of land within the area ceded by the Creeks and immediately west of the area retained by them.

In 1872 one Darling, a surveyor acting for the government, surveyed the Sac and Fox tract and erroneously extended his lines and closing corners eastward into the unceded Creek lands in disregard of the Bardwell dividing line. Darling's survey was approved by the Commissioner of the General Land Office in 1873; and as a result of this survey and its approval a strip of Creek lands between the Bardwell line and Darling's easterly closing corners, aggregating 5,575.57 acres, was erroneously included within the Sac and Fox tract as officially surveyed and platted, and thereafter was occupied by the Sac and Fox. In 1875 one Hackbusch, a government surveyor, subdivided the sections in the Sac and Fox lands into 40 acre tracts and followed Darling's lines into the unceded

---

[3] Act March 1, 1889, c. 317, 25 Stat. 757, 758.

[4] Treaty of February 18, 1867, Art. 6, 15 Stat. 495, 496.

Creek lands, thereby perpetuating Darling's error. Hackbusch's survey, like that of Darling, was approved by the Commissioner of the General Land Office.

By an agreement ratified in the act of February 13, 1891,[5] the Sac and Fox ceded to the United States the tract assigned to them under the treaty of 1867. In the agreement the United States stipulated it would make allotments in severalty to the Sac and Fox Indians out of lands within their cession; and the ratifying act required that these allotments be made and that the remaining lands be opened to settlement as public lands and sold to settlers at a stated price per acre, which was to be turned into the treasury as public money.

In carrying that act into effect the Indian and land bureaus of the United States erroneously treated the strip of unceded Creek lands between Bardwell's line on the west and Darling's closing corners on the east as part of the Sac and Fox cession, and accordingly allotted and patented part of the strip to Sac and Fox Indians, by way of fulfilling the Government's obligation to them; sold and patented other lands therein to settlers; and turned the purchase price received from such sales into the treasury as public money. These disposals included nearly all of the 5,575.57 acres in the strip, and the grantees have since been holding the same adversely to the Creek tribe.

In the court below, as its opinion shows, the parties were agreed that the lands in the strip were unceded Creek lands; and that as to such of them as were disposed of under the act of 1891 the Creek tribe is " entitled to compensation." But the parties were not agreed respecting the time as of which the value should be ascertained. The tribe contended for the value in 1926, when the suit was brought; while the Government stood for the value at the time of the appropriation, which it insisted was in 1873,

---

[5] C. 165, 26 Stat. 749, 750.

when Darling's erroneous survey was approved by the Commissioner of the General Land Office, or, in the alternative, at the time the lands were disposed of under the act of 1891.

The court below held the tribe entitled to the value of the lands, ruled the value at the time of suit should be allowed, found the value at that time was $30 an acre, and gave judgment accordingly. There was no finding of the value at either of the times named in the government's contention; but it is inferable from the record that the value was less at those times than when the suit was begun.

1. Counsel for the government, assuming that the present claim is merely for damages arising out of errors on the part of administrative officers, contend that it does not come within the terms of the jurisdictional act—" any and all legal and equitable claims arising under or growing out of any treaty or agreement between the United States and the Creek Indian Nation or Tribe, or arising under or growing out of any Act of Congress in relation to Indian affairs, which said Creek Nation or Tribe may have against the United States." We think the contention is not tenable.

Counsel's assumption ignores several elements of the claim, such as the treaties of 1833 and 1866 and the acts of Congress of 1889 and 1891. It also neglects matters reflecting a confirmation of the acts of the administrative officers, such as the receipt by the United States of direct and material benefits from their acts and its retention of the benefits with knowledge of all the facts.

While the jurisdictional act is couched in general terms, there can be little doubt when it is read in the light of the circumstances leading to its passage that it is intended to include the present claim. The congressional committees on whose recommendation the act was passed were in possession of all data bearing on the claim. The facts

had been laid before them in letters from the Secretary of the Interior, the Commissioner of Indian Affairs and the Commissioner of the General Land Office.[6] In the letters these officers, besides reciting the facts in detail, expressed their own conclusions in the matter, which were to the effect that the settlers and allottees had acquired and improved the lands in good faith, and therefore deserved consideration; that the Creek tribe was "entitled to compensation" for the lands "lost" by it through what had been done; that the unfortunate situation "grew out of errors of representatives of the government," which made it reasonable to expect the government to bear the expense of an adjustment; and that there was need for legislation under which the matter could be examined and brought to an equitable and final solution. In view of this portrayal of the matter by the officers specially charged with the administration of Indian and public-land affairs, and the subsequent action of the committees in effecting the passage of the jurisdictional act, we regard it as reasonably manifest that the act is intended to provide for the adjudication of the present claim. The concessions made in the court below by those who were there representing the Government show rather plainly that they so understood the act.

2. A question is raised as to whether there was an appropriation or taking of the lands by the United States.

The Creek tribe had a fee simple title, not the usual Indian right of occupancy with the fee in the United States. That title was acquired and held under treaties, in one of which the United States guaranteed to the tribe quiet possession. The tribe was a dependent Indian community under the guardianship of the United States, and therefore its property and affairs were subject to the control and management of that government. But this

---

[6] Senate Report No. 2561, p. 54, 59th Cong., 1st Sess., and papers named in letter of Secretary of the Interior.

power to control and manage was not absolute. While extending to all appropriate measures for protecting and advancing the tribe, it was subject to limitations inhering in such a guardianship and to pertinent constitutional restrictions. It did not enable the United States to give the tribal lands to others, or to appropriate them to its own purposes, without rendering, or assuming an obligation to render, just compensation for them; for that "would not be an exercise of guardianship, but an act of confiscation." *Lane* v. *Pueblo of Santa Rosa*, 249 U. S. 110, 113; *Cherokee Nation* v. *Hitchcock*, 187 U. S. 294, 307-308.

Such was the situation when the lands in question were disposed of under the act of 1891. The disposals were made on behalf of the United States by officers to whom it had committed the administration of that act, and were consummated by the issue of patents signed by the President.

True, the tribe, if free and prepared to proceed in its own behalf, might have successfully assailed the disposals; but it was not in a position where it could be expected to assume that burden. It was in a state of tutelage and entitled to rely on the United States, its guardian, for needed protection of its interests. Plainly the United States would have been entitled to a cancellation of the disposals had it instituted suits for that purpose.[7] But, although having full knowledge of the facts, it made no effort in that direction. On the contrary, it permitted the disposals to stand—not improbably because of the unhappy situation in which the other course would leave the allottees and settlers. In this way the United States in effect confirmed the disposals; and it emphasized the confirmation by retaining, with such full knowledge, all the benefits it has received from them.

[7] *United States* v. *Minnesota*, 270 U. S. 181, 194–196, and cases cited.

We conclude that the lands were appropriated by the United States in circumstances which involved an implied undertaking by it to make just compensation to the tribe.[8]

3. Plainly the appropriation was not in 1873, when Darling's survey was approved by the Commissioner of the General Land Office. That survey did not effect any change in the existing ownership; nor was it intended to do so. The most that can be said of it is that it was done erroneously and, in the absence of correction, might lead to further error.

But not so of the disposals under the act of 1891. They were intended from their inception to effect a change of ownership and were consummated by the issue of patents, the most accredited type of conveyance known to our law. True, they rested on an erroneous application of the act of 1891 to the Creek lands in the strip; but, as that application was confirmed by the United States, the matter stands as if the act had distinctly directed the disposals. It was through them that the lands were taken; so the compensation should be based on the value at that time, and not, as ruled below, on the value when the suit was begun.

But the just compensation to be awarded now should not be confined to the value of the lands at the time of the taking but should include such addition thereto as may be required to produce the present full equivalent of that value paid contemporaneously with the taking.[9] Interest at a reasonable rate is a suitable measure by which to ascertain the amount to be added.[10] The treaty

---

[8] *United States* v. *Lynah,* 188 U. S. 445, 465; *United States* v. *North American Co.,* 253 U. S. 330, 333; *Phelps* v. *United States,* 274 U. S. 341, 343. And see *United States* v. *State Bank,* 96 U. S. 30, 36.

[9] *Jacobs* v. *United States,* 290 U. S. 13, and cases cited.

[10] *United States* v. *Rogers,* 255 U. S. 163, 169; *Seaboard Air Line Ry.* v. *United States,* 261 U. S. 299, 304–306.

of 1866, the act of 1889 and other statutes show that five per cent per annum is a reasonable rate as between the parties here.[11]

It follows that the judgment must be reversed, with directions for such further proceedings as may be necessary to bring the award of compensation into conformity with this opinion.

*Judgment reversed.*

---

[11] Creek Treaty of 1866, Art. 3, 14 Stat. 785, 787; Act of March 1, 1889, c. 317, 25 Stat. 757, 758, 759; U. S. C. Title 25, § 158.