**Edna Emerson LITTLEWOLF, et al., Appellants,**

v.

**Manuel LUJAN, Jr., Secretary of the Interior, et al.**

**No. 88–5172.**

United States Court of Appeals, District of Columbia Circuit.

Argued Jan. 23, 1989.

Decided June 30, 1989.

Michael D. Ratner, with whom R. Bruce Rich and Gloria C. Phares, New York City, were on the brief, for appellants.

Edward J. Passarelli, Atty., Dept. of Justice, with whom Roger J. Marzulla, Asst. Atty. Gen., and Robert L. Klarquist, Atty., Dept. of Justice, Washington, D.C., were on the brief, for federal appellees.

Bruce J. Terris and Kathryn A. Bleecker, Washington, D.C., were on the brief, for appellees Becker, Clearwater, and Mahnomen Counties.

James M. Schoessler, Asst. Atty. Gen., for the State of Minn., and William A. Szotkowski, St. Paul, Minn., were on the brief, for appellee State of Minn.

William T. Finley, Jr. and David F.B. Smith, Washington, D.C., were on the brief, for amicus curiae American Land Title Ass'n in support of appellees, urging affirmance.

Before ROBINSON, STARR,* and BUCKLEY, Circuit Judges.

Opinion for the court filed by Circuit Judge BUCKLEY.

BUCKLEY, Circuit Judge:

Appellants, members of the White Earth Band of the Chippewa Tribe, seek review of the district court's decision upholding the constitutionality of the White Earth Reservation Land Settlement Act of 1985. The Act extinguishes the Indians' claims to land illegally transferred earlier in this century, in return for payment of compensation based on the fair market value at the time of transfer plus five percent interest. The Act gives claimants the option of filing an action for judicially determined compensation within six months of the issuance of notice of the payment due them, in which case they forego their statutory compensation.

---

* Judge Starr recused himself from further consideration of this case after oral argument and took no part in this decision.

Appellants argue that the White Earth Reservation Land Settlement Act violates the Fifth Amendment in two ways. First, they assert that the six-month limitations period is unreasonable under the Due Process clause because the federal government has breached its trust duty to provide the Indians with information sufficient to enable them to bring timely claims. Second, the Chippewas contend that the Act effects a taking of their property without just compensation.

We find it unnecessary to resolve the Due Process issues because even if we assume that the period allowed for filing claims is unreasonably short and "takes" the White Earth Indians' property rights, we conclude that the Act's compensation provision (land value plus interest) is reasonable; furthermore, the Act permits a Band member to challenge the adequacy of the statutory compensation in a Tucker Act suit.

As the Act does not contravene the Fifth Amendment, we affirm the district court's judgment.

## I. BACKGROUND

### A. Historical Framework

Through a series of treaties, the Chippewa Indian Tribe ceded substantial territory in Minnesota to the United States in return for payments and the creation of the 830,000-acre White Earth Reservation. *See, e.g.*, Treaty with the Chippewa Indians, March 19, 1867, 16 Stat. 719. With the General Allotment Act of 1887, 24 Stat. 388, as applied to White Earth through the Nelson Act of 1889, 25 Stat. 642, Congress began a policy of breaking up tribal reservations and granting parcels (usually eighty acres) to individual Indians through "trust patents," which provided that the United States would hold each allotment in trust for twenty-five years and then convey title in fee to the allottee. During this period, the property would be tax-exempt and could not be conveyed or encumbered without the approval of the Secretary of the Interior ("Secretary").

Pursuant to the Nelson Act, about 5,000 trust patents were issued, most of them in 1902. The Steenerson Act of 1904, 33 Stat. 539, authorized the President to make additional allotments, so that each Chippewa legally residing on White Earth would receive 160 acres. *See generally* Peterson, *That So–Called Warranty Deed: Clouded Land Titles on the White Earth Indian Reservation in Minnesota*, 59 N.Dak.L. Rev. 159, 164 (1983) (sources cited).

Congress purported to abolish the trust relationship established by the General Allotment Act when it adopted the Clapp Amendment of 1906, 34 Stat. 325, 353, as amended by the Act of March 1, 1907, 34 Stat. 1015, 1034. That statute removed "all restrictions as to the sale, incumbrance [sic], or taxation for allotments within the White Earth Reservation ... held by *adult mixed-blood Indians*" and also authorized the Secretary of the Interior to grant fee simple title to *adult full-blood* applicants deemed "competent to handle their own affairs." *Id.* (emphasis added). The Amendment resulted in the swift transfer to private parties of the vast majority of reservation land from Indians who had been granted fee simple ownership. *See, e.g.*, S.Rep. No. 192, 99th Cong., 1st Sess. 6 (1985) (by 1909, ninety percent of lands allotted to full bloods had been sold or mortgaged, and eighty percent of reservation land was owned by non-Indians). The loss of tax-exempt status allowed state and county governments to tax the allotments, many of which were later lost through tax forfeitures. Peterson, *supra*, at 175–76.

Subsequently, courts interpreting the Clapp Amendment emphasized its distinction between full and mixed blood Indians and also concluded that contrary to the original assumption, full bloods continued to enjoy a limited trust relationship under the Amendment. These decisions, which set aside certain sales, prompted Congress to create a commission to compile a roll indicating whether an allottee was of full or mixed blood. 38 Stat. 77, 88–89 (1913). The Clapp Amendment was widely interpreted as having ended the trust relationship between the federal government and mixed bloods. For example, in 1915 the

Solicitor for the Department of the Interior ("DOI" or "Interior") concluded that the Amendment had terminated his duty to probate the estates of mixed blood allottees, Opinion of the DOI Solicitor, No. D–29636 (Aug. 2, 1915)—seemingly in disregard of the Secretary's duty to determine the heirs of allottees who had died before expiration of the trust period, 36 Stat. 855 (1910) (codified at 25 U.S.C. § 372). Minnesota state courts assumed this probate function.

In *Morrow v. United States*, 243 F. 854 (8th Cir.1917), however, the Eighth Circuit held that trust patents vested in mixed blood allottees an unalterable property right to tax immunity for twenty-five years and suggested that the Clapp Amendment could not unilaterally terminate the trust relationship. Thus, *Morrow* voided tax forfeitures of trust properties and cast doubt upon the validity of many land transfers made from 1906 to 1917. Nonetheless, the Department of Justice, as counsel for the government, made only sporadic efforts to bring suit on behalf of Indians whose land had been illegally conveyed. This lack of enforcement action continued despite successive extensions of the trust period. *See* Exec. Orders No. 4642 (1927), No. 5768 (1931), and No. 5953 (1932); Indian Reorganization Act of 1934, 25 U.S.C. § 462 (1982) (extending trust indefinitely).

In the late 1970's, several events forced a change in this pattern of neglect of the Indians' legal rights. The most important was the Minnesota Supreme Court's decision in *State v. Zay Zah*, 259 N.W.2d 580 (Mn.1977), *cert. denied*, 436 U.S. 917, 98 S.Ct. 2263, 56 L.Ed.2d 758 (1978), holding that the Clapp Amendment could not unilaterally abrogate the trust status of a White Earth allotment. Thus, allotments held in trust by the United States retained their tax immunity until the patentee requested and received fee simple title. *Id.* at 586. The court concluded that the allotment at issue was not subject to tax forfeiture and that equitable title remained in the allottee's heirs. *Id.* at 586–89.

In 1979, the DOI Solicitor interpreted *Zay Zah* as invalidating title acquired not only through tax forfeiture, but also through state probate awards and "other forms of involuntary alienation" (e.g., purchase, without Interior's approval, from mixed blood Chippewas under twenty-one years of age). *See* DOI Memorandum from the Solicitor to the Assistant Secretary, Indian Affairs (May 9, 1979), *reprinted in* White Earth Indian Land Claims Settlement: Hearings on S.1396 before the Senate Select Comm. on Indian Affairs, 99th Cong., 1st Sess. at 102–06 (1985) ("Hearings on S.1396"). Reversing the Solicitor's 1915 opinion, the Interior Department acknowledged its duty to re-probate all estates and make current heirship determinations. *Id.* Accordingly, the Department's Bureau of Indian Affairs sent hundreds of letters advising holders of land from the original White Earth Reservation about possible title defects and notifying them that the agency would "make every attempt to clear the United States' title to these lands" and would recommend to the Justice Department that suits be filed on behalf of the Indians to recover illegally appropriated land and related damages. *See* Hearings on S.885 before the Select Comm. on Indian Affairs, 98th Cong., 1st Sess. at 116–18 (1983) (reproducing letters).

*Zay Zah* and the DOI's actions clouded title to over 100,000 acres in Becker, Clearwater, and Mahnomen Counties in Minnesota and involved transfers that had, in major part, taken place more than half a century earlier. *See* S.Rep. No. 192 at 11. Even though the Justice Department never actually brought any suits, the threat of legal action resulted in social and economic chaos. *See* Hearings on S.1396 at 117–21, 148–52.

B. The White Earth Reservation Land Settlement Act

To foreclose the possibility of interminable litigation, on March 24, 1986, Congress passed the White Earth Reservation Land Settlement Act, Pub.L. No. 99–264, 100 Stat. 61, *reproduced at* 25 U.S.C. § 331 (note) ("WELSA" or "Act"). Congress found that "claims on behalf of Indian allottees or heirs and the White Earth Band involving substantial amounts of land ...

are creating great hardship and uncertainty for government, Indian communities, and non-Indian communities," and that it was in the long-term interest of all affected parties to implement a fair settlement of the unresolved, legally uncertain claims. *Id.* § 2.

The Act extinguishes claims for land and damages by White Earth allottees and their heirs in return for administratively determined compensation. Section 7 directs the Secretary of the Interior to investigate all reservation allotments and to list in the Federal Register and specified newspapers those allotments, or interests in allotments, that fall within the categories enumerated in sections 4(a), 4(b), and 5(c) (e.g., tax forfeitures, unapproved sales by full bloods and minors, and sales by court-appointed representatives). Section 8(a) sets the compensation at the fair market value of the land at the time of the defective transaction, less compensation already received, plus five percent interest compounded annually from the date of transfer until March 24, 1986 (the date of the Act's enactment), and at the DOI's general interest rate thereafter. Section 8(c) requires the Secretary to provide allottees or their heirs with written notice of the compensation due them.

Section 6(d) permits any claimant to challenge the constitutional adequacy of such compensation as applied to his particular allotment or interest by filing suit under the Tucker Act, 28 U.S.C. § 1491, within 180 days of receiving notice of the Secretary's compensation determination. Bringing such an action, however, precludes a claimant from receiving compensation under section 8. Section 6(c) similarly provides that filing an action in federal court to recover title and damages bars statutory compensation. Section 6(c) further states that such lawsuits will be barred after the later of 180 days following the enactment of WELSA or the date the Secretary publishes a notice in the Federal Register that the conditions set forth in section 10 have been met; namely, that Minnesota donate 10,000 acres of "reasonable value" to the United States to be held in trust for the White Earth Band and appropriate $500,-

000 for technical assistance, and that Congress appropriate $6.6 million for the Band. On March 21, 1988, approximately two years after WELSA's enactment, the Secretary published a notice that these conditions had been fulfilled. *See* 53 Fed.Reg. 9150.

Finally, section 8(d) of the Act provides that the Secretary's administrative determination of appropriate compensation "may be judicially reviewed pursuant to the Administrative Procedure Act," 5 U.S.C. §§ 701–706 (1982), within 180 days of issuance of notice, with exclusive jurisdiction vested in the United States District Court for the District of Minnesota.

## C. The Indians' Claims and the District Court's Decision

White Earth Band members have challenged WELSA on two Fifth Amendment grounds. First, they argue that section 6(c)'s statute of limitations violated their Due Process rights by failing to grant them a reasonable opportunity to bring suits to recover land and damages. Second, the Indians contend that the Act effected a "taking" of their property on the date WELSA's statute of limitations expired (thereby extinguishing their legal claims), and that the Act's payment provisions do not ensure just compensation.

In *Littlewolf v. Hodel,* 681 F.Supp. 929 (D.D.C.1988), the district court rejected these arguments and rendered summary judgment against Band members who sought a declaratory judgment that WELSA was unconstitutional. In its Due Process analysis of the statute of limitations, the trial court initially focused on whether, under all the circumstances, plaintiffs had a "reasonable time" to commence an action —a judgment left to the legislature "unless the time allowed is manifestly so insufficient that the statute becomes a denial of justice." *Id.* at 939, citing *Wilson v. Iseminger,* 185 U.S. 55, 63, 22 S.Ct. 573, 575, 46 L.Ed. 804 (1902); *see also Texaco v. Short,* 454 U.S. 516, 527–28, 102 S.Ct. 781, 791, 70 L.Ed.2d 738 (1982). The court observed that there was nothing "presumptively unreasonable about this limitations period,"

citing cases upholding statutes of limitations from six months to a year in duration. 681 F.Supp. at 940. The court then concluded that the period at issue was "unquestionably reasonable in light of the legislative goals underlying the White Earth Act," namely, the quieting of title by giving White Earth allottees' heirs the choice of either promptly bringing an action or relinquishing their land claims in return for an administratively determined monetary settlement. *Id.* The court noted, however, that as a result of the delay in certification, potential claimants had actually had over twenty-three months within which to bring suit. *Id.* at n. 6.

Turning to the Band's argument that their status as trust beneficiaries and their distressed circumstances required special consideration, the district court concluded that reasonable statutes of limitations (such as the Act's) apply even where trust obligations exist. 681 F.Supp. at 940–41, citing, *e.g., United States v. Mottaz,* 476 U.S. 834, 106 S.Ct. 2224, 90 L.Ed.2d 841 (1986). The court also dismissed the White Earth Band's argument that its members' poverty and lack of education made it unrealistic—hence inherently unreasonable—for them to bring suit within the limitations period because, regardless of actual ignorance or lack of financial resources, plaintiffs' knowledge of their affairs and legal rights would be imputed. 681 F.Supp. at 941–42, citing, *inter alia, Menominee Tribe v. United States,* 726 F.2d 718 (Fed. Cir.), *cert. denied,* 469 U.S. 826, 105 S.Ct. 106, 83 L.Ed.2d 50 (1984). The court further ruled that Congress had provided the Indians with adequate notice of their right to sue. 681 F.Supp. at 942–44.

The district court also rejected plaintiffs' claims under the "takings" clause, holding that the payment provided under section 8 of WELSA, coupled with the availability of a Tucker Act remedy in those cases where an allottee or heir considered such payment inadequate, constituted just compensation. *Id.* at 944–48.

The White Earth class claimants have appealed; this court has jurisdiction under 28 U.S.C. § 1291.

## II. DISCUSSION

### A. Introduction

■ Appellants face formidable obstacles in challenging the White Earth Land Settlement Act. First, federal statutes enjoy a presumption of constitutionality, especially where, as here, Congress explicitly considered constitutional questions. *Littlewolf,* 681 F.Supp. at 938, citing *Rostker v. Goldberg,* 453 U.S. 57, 64, 101 S.Ct. 2646, 2651, 69 L.Ed.2d 478 (1981). This deference acknowledges Congress' role as the policymaking branch. Here, for example, it balanced the competing interests of the White Earth Band, government bodies, and non-Indian communities in light of complex historical, legal, economic, and social factors. Second, courts have been reluctant to interfere with Congress' plenary power over Indian affairs (derived from Article I, § 8, cl. 3), especially in property matters. *See, e.g., Lone Wolf v. Hitchcock,* 187 U.S. 553, 23 S.Ct. 216, 47 L.Ed. 299 (1903) (upholding statute ceding Indian land without tribe's consent and in abrogation of treaty).

■ Though plenary, Congress' power is not absolute. "While extending to all appropriate measures for protecting and advancing the tribe, it [is] subject to limitations inhering in ... a guardianship and to pertinent constitutional restrictions." *United States v. Sioux Nation of Indians,* 448 U.S. 371, 415, 100 S.Ct. 2716, 2741, 65 L.Ed.2d 844 (1980) (quoting *United States v. Creek Nation,* 295 U.S. 103, 109–10, 55 S.Ct. 681, 684, 79 L.Ed. 1331 (1935)); *see generally* F. Cohen, *Handbook of Federal Indian Law* 220–21 (1982 ed.). This guardian-ward relationship derives from the historical status of Indian tribes as "domestic dependent nations," *Cherokee Nation v. Georgia,* 30 U.S. (5 Pet.) 1, 17, 8 L.Ed. 25 (1831), and the correspondingly pervasive federal control over Indians as embodied in treaties and statutes. Indeed, in this instance Congress expressly acknowledged its role as guardian by creating "trust" obligations on the part of the United States in the General Allotment and Nelson Acts.

Traditionally, courts have enforced trusteeship duties only against executive branch officers, usually under a common law fiduciary duty theory. *See, e.g., Seminole Nation v. United States,* 316 U.S. 286, 62 S.Ct. 1049, 86 L.Ed. 1480 (1942). In contrast, courts have viewed Congress' trust responsibility as merely a moral obligation to deal with Indians in good faith, and have treated federal Indian laws as raising non-justiciable political questions. *See, e.g., Lone Wolf,* 187 U.S. at 565–66, 23 S.Ct. at 221. *See generally* Chambers, *Judicial Enforcement of the Federal Trust Responsibility to Indians,* 27 Stan.L.Rev. 1213, 1223–34 (1975) (discussing disparity in judicial application of trust duty against executive and legislative branches). As the Supreme Court noted in *Sioux Nation,* however, *Lone Wolf*'s Indian political question doctrine "was expressly laid to rest in *Delaware Tribal Business Comm. v. Weeks,* 430 U.S. 73, 84, 97 S.Ct. 911, 918, 51 L.Ed.2d 173 (1977)," which "establish[ed] a standard of review for judging the constitutionality of Indian legislation under the Due Process Clause of the Fifth Amendment." 448 U.S. at 413 & 414 n. 28, 100 S.Ct. at 2739 & 2740 n. 28. The *Weeks* test focuses on whether the statute's objectives are "tied rationally to the fulfillment of Congress' unique obligation toward the Indians." *Weeks,* 430 U.S. at 85, 97 S.Ct. at 919 (quoting *Morton v. Mancari,* 417 U.S. 535, 555, 94 S.Ct. 2474, 2485, 41 L.Ed.2d 290 (1974)). Of course, courts have the power to invalidate any law that violates the Constitution. *See, e.g., Sioux Nation, supra; Hodel v. Irving,* 481 U.S. 704, 107 S.Ct. 2076, 95 L.Ed.2d 668 (1987).

In this case, we must examine appellants' constitutional challenges in light of both Fifth Amendment principles and a determination of whether Congress' exercise of its plenary power was reasonably related to its trust responsibility to the White Earth Band.

## B. The Indians' Constitutional Claims

### 1. General Considerations

The district court found, as an initial matter, that despite the constraint placed on property rights by the Act's six-month limitation on the filing of claims, the limitation was valid because it was "rationally related to the government's legitimate interest in protecting thousands of Indian claimants from the need to litigate thousands of expensive, time-consuming individual actions to recover any compensation for their claims." 681 F.Supp. at 939. We agree that Congress' stated justification meets *Weeks'* "tied rationally" test. Nevertheless, although we do not question Congress' objectives, we must determine whether the means chosen to achieve those legitimate ends comport with the requirements of the Fifth Amendment, which states:

> No person shall be ... deprived of life, liberty, or property, without due process of law; nor shall private property be taken for public use, without just compensation.

### 2. Due Process Claims

White Earth Band members argue that WELSA contains not a typical *limitations* provision designed to bar stale claims but, rather, an unreasonably short limitations period designed to prevent Indians with valid claims from having access to the courts. They assert that the Act unfairly deprives them of their property interests without due process by failing to provide them adequate notice and a reasonable period within which to assert their rights.

Specifically, appellants charge that the United States has breached its trust obligation to identify and investigate their land claims and to disclose factual information within the government's control that is necessary to enable members of the Band to bring their claims. The Indians contend that they justifiably relied on two promises made by the federal government in 1979 to fulfill its trust responsibilities. One was the Bureau of Indian Affairs' assertion, in letters to hundreds of landholders, stating its intention to make every attempt to clear title. The other was the Interior Department's acknowledgment of its statutory duty, neglected for over six decades, to probate the White Earth allottees' estates

—a process that will supersede state and county title records. The Indians argue that as the government has already had a decade to conduct this re-probate and will take several more years to compile the lists necessary for determining WELSA compensation, it is unreasonable for Band members to be allowed only six months or even two years to sue on these claims.

■ We find it unnecessary to address the difficult questions raised by appellants regarding the Due Process adequacy of the period provided by the Act. Even if we assume *arguendo* that the six-month limitations period is unreasonably short and that, as a consequence, the Act effectively "takes" the Band members' property rights, we conclude that the statute provides the Indians with just compensation, for the reasons discussed below.

### 3. *Just Compensation Issues*

The Act contains two major compensation provisions. First, section 8 authorizes the Secretary of the Interior to make an administrative determination of the appropriate amount of payment for each unlawfully transferred allotment, computed at "the fair market value of the land interest ... as of the date of tax forfeiture, sale, allotment, mortgage, or other transfer" described in sections 4(a), 4(b), and 5(c), plus interest compounded annually at five percent from this date. *Id.* § 8(a).

Second, section 6(d) permits allottees entitled to statutory compensation to challenge the constitutional adequacy of the amount of this compensation by filing suit under the Tucker Act, 28 U.S.C. § 1491. If Congress had simply prescribed the ordinary Tucker Act procedure, which allows an action to be brought in the Court of Claims "within six *years* after such claim first accrues," 28 U.S.C. § 2501 (emphasis added), there would be little dispute about WELSA's validity under the Fifth Amendment: a Tucker Act "safety net" suffices when "a statute's 'basic compensation scheme ... is valid but could result in payment of less than the constitutional minimum.'" *Littlewolf,* 681 F.Supp. at 946 (quoting *Regional Rail Reorganization Act Cases,* 419 U.S. 102, 150, 95 S.Ct. 335, 362, 42 L.Ed.2d 320 (1974)).

Section 6(d), however, requires that such suits be brought within six *months* after the date on which the Secretary issues the notice of compensation determination that must be given to an allottee or his heirs pursuant to section 8(c). Furthermore, section 6(d) provides that Indians who choose to file a Tucker Act suit must forego their administrative compensation. The Chippewas argue that this six-month limitations period, coupled with the possibility that they may fail to receive any award, renders the Tucker Act safety net a "delusive remedy."

The district court disagreed. It interpreted the Tucker Act as barring suits unless brought within six years of the date the property was taken (or when the owner had "constructive notice" of the taking). 681 F.Supp. at 947. As the administrative notification date would "almost certainly" occur more than six years after the taking (or constructive notice thereof), the court concluded that the Indian claimants would have had at least six years (and probably more) to file suit. *Id.*

Conceding that some plaintiffs might not learn of the "taking" until they received notice pursuant to section 8(c) and would therefore be deprived of the Tucker Act's six-year grace period, the district court nonetheless upheld the validity of the six-month limitations period because it could not "fault Congress' judgment that White Earth claimants could reasonably bring suit for just compensation within six months after receiving an administrative determination of the amount of compensation to which they are entitled." *Id.* at 947–48. The court further noted that the factual record compiled by the Secretary would enable an allottee to bring suit far more swiftly than an ordinary Tucker Act claimant. *See id.* at 948.

We agree with the district court's conclusion that the Act's payment provisions represent "a good faith effort to compensate plaintiffs fairly" under the Just Compensation clause and that the six-month period allowed for filing a Tucker Act claim meets Due Process standards. *Id.* at 946. First, we conclude that section 8's basic compensation mechanism will yield a fair payment

in most cases and therefore does not, on its face, violate the Just Compensation clause. *See, e.g., United States v. Creek Nation,* 295 U.S. 103, 111–12, 55 S.Ct. 681, 684–85, 79 L.Ed. 1331 (1935) (just compensation requires payment of amount equivalent to fair market value of land plus reasonable interest). Moreover, the Tucker Act "safety net" ensures full compensation in those particular instances where the statutory payment might not adequately compensate claimants.

Second, under the circumstances of this case, we find that section 6(d)'s six-month period following notice of the Secretary's determination of compensation provides as meaningful Due Process protection as a six-year period without notice. By enacting this statute, Congress has alerted White Earth Band members that the Secretary will be processing information about each allotment over the next several years and that he will notify interested allottees and heirs of his final compensation determinations. In light of this notice and the availability of detailed data about the allotments, six months is a reasonable period in which to file a challenge. It follows that we also find adequate the 180–day limit imposed by section 8(d) on challenges to administrative determinations brought under the Administrative Procedure Act.

If an Indian elects to sue under the Tucker Act rather than accept the amount proffered by the Secretary, that action would be the appropriate forum in which to determine the nature of the property interest taken (i.e., land or legal claims) and the precise date of the taking for valuation purposes. Hence, we need not address the Band's argument that the "taking" occurred on the date that WELSA's limitations period expired (March 21, 1988) and extinguished the Indians' legal claims—not at the time the property was illegally transferred (e.g., to private parties), and that the property's value should be measured accordingly. *But see Littlewolf,* 681 F.Supp. at 945–46 ("taking" occurred on date allotment improperly alienated and government/trustee failed to intervene, entitling claimant to compensation consisting of fair market value of land on date of taking, plus a reasonable interest rate). As we

find it unnecessary to reach this issue, we express no opinion as to the district court's discussion of it.

In sum, we hold that the Act's compensation provisions meet constitutional requirements under both the Just Compensation and Due Process clauses.

### III. CONCLUSION

Exercising its plenary power over Indian affairs, Congress carefully balanced competing interests and considered complex historical, social, legal, and economic factors before passing the White Earth Reservation Land Settlement Act. Consistent with separation of powers principles, this court's task is not to determine whether the Act achieves perfect justice, but rather to ensure that it conforms with both the federal guardianship responsibility and the Constitution. As we conclude that the Act meets both standards, we affirm the district court's judgment.

*So ordered.*