**RED LAKE BAND OF CHIPPEWA INDIANS, et al., Plaintiffs,**

v.

**Ross SWIMMER, et al., Defendants.**

**Civ. A. No. 89–0209–LFO.**

United States District Court, District of Columbia.

June 4, 1990.

M. Frances Ayer, Pirtle, Morisset, Schlosser & Ayer, Washington, D.C., and Mason Morisset, Pirtle, Morisset, Schlosser & Ayer, Seattle, Wash., for the Red Lake Band of Chippewa Indians.

George Fettinger, Fettinger & Bloom, Alamogordo, N.M., for the Mescalero Apache Tribe.

Edward J. Passarelli, U.S. Dept. of Justice, Michael D. Cox, Acting Asst. Solicitor, Dept. of Interior, Washington, D.C., of counsel, for defendants.

## MEMORANDUM

OBERDORFER, District Judge.

In this action, plaintiffs, the Red Lake Band of Chippewa Indians ("RLB") and the Mescalero Apache Tribe ("MAT"), sue the Department of the Interior to prevent the implementation of the Indian Gaming Regulatory Act of 1988, 25 U.S.C. §§ 2701–2721 ("Gaming Act" or "Act"). The Act would regulate gaming that occurs on Indian tribal land by dividing games into one of three different classes, according to the game at issue. Those games that fall into Class I, which include social or traditional games played in connection with tribal ceremonies or celebrations, would be exclusively regulated by the tribes. Those games that fall into Class II, which include bingo-related games and card games, would be permitted if the state permits such gaming for any purpose. Those games that fall into Class III, which include all gaming not included in Class I or II, such as casino-type games and parimutuel betting, would be permitted only if such gaming is authorized by a tribal ordinance approved by the chairperson of a commission established by the Act, is located in a state that permits such gaming, and is conducted in conformity with a tribal-state compact.

■ Defendants' motion to dismiss all claims presented in the complaint is now pending before this Court. Those claims for which the motion to dismiss can be resolved on the basis of the pleadings must be dismissed under Fed.R.Civ.P. 12(b)(6) if it appears "beyond doubt that, under any reasonable reading of the complaint, the plaintiff will be unable to prove any set of facts that would justify relief." *Haynesworth v. Miller*, 820 F.2d 1245, 1254 (D.C. Cir.1987); *see also Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–102, 2 L.Ed.2d 80 (1957). Those claims for which resolution of the motion to dismiss requires consideration of matters outside the pleadings must be evaluated under the standard "for summary judgment and disposed of as provided in Rule 56." Fed.R.Civ.P. 12(b). Under this standard, judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). Because plaintiffs fail to meet their burden of pleading or proof on each count, an accompanying Order will grant defendant's motion to dismiss on all counts.

### I.

Plaintiffs' ten-count complaint presents four different types of attacks on the legitimacy of the Act. First, plaintiffs contend that the Act violates their right to self-determination as preserved both in treaties with the federal government (Counts I and II) and in aboriginal rights never surrendered to the federal government (Counts III and IV). Second, plaintiffs argue that, in passing the Act, Congress violated its federal trust responsibility to the Indians (Count V). Third, plaintiffs argue that the Act unconstitutionally restricts the power of federal courts.[1] Fourth, plaintiffs contend that the Act violates their fundamental right to self-government in violation of

---

1. The third and fourth types of attack on the legitimacy of the statute are not presented in plaintiffs' complaint. However, because plaintiffs present these attacks in their opposition to defendant's motion to dismiss and all parties had the opportunity to brief these issues, they will be considered in this Memorandum and Order.

the Fifth Amendment.[2] Each of these claims, and the grounds on which the government moves to dismiss it, is discussed in turn.

### A.

Plaintiffs first assert that the Act violates the Indian tribes' rights to self-determination and self-governance guaranteed by the treaties between the Indian tribes and the United States government and by aboriginal rights never surrendered by the Indian tribes. In their motion to dismiss, defendants argue that, to the extent that any rights to self-determination were preserved by the Indians, whether explicitly by treaty, or implicitly by failure to surrender aboriginal rights, they are subject to complete defeasance by Congress. Thus, defendants declare, plaintiffs' claims on this issue fail because the actions alleged to have been committed by Congress do not violate the law.

■ Defendant correctly asserts that under Supreme Court doctrine, Congress holds virtually unlimited power over the Indian tribes. As expressed most clearly in *Lone Wolf v. Hitchcock*, 187 U.S. 553, 23 S.Ct. 216, 47 L.Ed. 299 (1903), Congress has plenary power to

> abrogate the provisions of an Indian treaty, though presumably such power will be exercised only when circumstances arise which will not only justify the government in disregarding the stipulations of the treaty, but may demand, in the interest of the country and the Indians themselves, that it should do so. When, therefore, treaties were entered into between the United States and a

tribe of Indians it was never doubted that the *power* to abrogate existed in Congress....

*Id.* at 568, 23 S.Ct. at 222, *cited with approval in Rosebud Sioux Tribe v. Kneip*, 430 U.S. 584, 594, 97 S.Ct. 1361, 1367, 51 L.Ed.2d 660 (1977). Moreover, to the extent that any right to self-determination is derived from the Indian's aboriginal rights, that, too, is subject to complete defeasance at the will of Congress. In the Supreme Court's words, "The sovereignty that the Indian tribes retain is of a unique and limited character. It exists only at the sufferance of Congress and is subject to complete defeasance." *United States v. Wheeler*, 435 U.S. 313, 323, 98 S.Ct. 1079, 1086, 55 L.Ed.2d 303 (1978); *see also Washington v. Yakima Nation*, 439 U.S. 463, 501, 99 S.Ct. 740, 761, 58 L.Ed.2d 740 (1979). As stated bluntly by one district judge, "As against Congress, tribal sovereignty is but a stick in front of a tank." *Native Village of Venetie v. State of Alaska*, 687 F.Supp. 1380, 1392 (D.Alaska 1988).

Plaintiffs ask that this Court refuse to allow Congress to assert the vast power over Indians that doctrine of plenary power would allow. In doing so, they are in accord with a number of authorities who criticize the doctrine of plenary power on a multitude of grounds. One district judge argues that the doctrine of plenary power, and its corollary doctrine that the tribes retained all sovereignty not seized by Congress, were developed "to legitimize acquisitions [of land] by agreements with small groups of people purporting to bind entire nations.... To put it plainly the doc-

---

**2.** Plaintiffs' complaint also presents several other counts: Count VI contends that the Act, by authorizing compacts between the states and the Indian tribes, violated Article 1, sec. 10 of the Constitution (commonly referred to as "the Treaty Clause"); Count VII contends that the Act violated the Indian Self–Determination and Education Assistance Act, 25 U.S.C. §§ 450–450n; Count VIII contends that the Act violated the United States Constitution by permitting gaming under certain circumstances by some tribes but not other tribes without any rational basis. Count IX contends that the Act violated "fundamental standards of federal jurisdiction and United States relationships with Indian

tribes by impermissibly authorizing state jurisdiction, regulation, and taxation of Indian tribes in violation of the Constitution, treaties, and laws of the United States;" Count X argues that the Act illegally delegates authority to the Chairman of the Gaming Commission. As plaintiffs did not oppose the government's motion to dismiss these counts, the motion to dismiss will be treated as conceded insofar as they are concerned. *See* Rules of the United States District Court for the District of Columbia, Rule 108 (if motion is not opposed, "the court may treat the motion as conceded"). They are therefore not discussed in this opinion.

trine[s] w[ere] invented in large part to take the Indians' land." *Native Village of Venetie*, 687 F.Supp. at 1389. Constitutionally, the doctrine of plenary power has been said to "rest[ ] on vague and extraordinarily unexamined foundations." Comment, *Federal Plenary Power in Indian Affairs After Weeks & Sioux Nation*, 131 U.Pa.L.Rev. 235, 235 (1982). Practically, it has been condemned for allowing infringement on the rights of Indians by "groups eager for access to tribal and Indian resources" "often with disastrous impact on the tribes." *Id.* at 235–36. In addition, it has been criticized as embodying the vestiges of the racial and cultural prejudice prevalent during the early part of this century that prompted Indians to be viewed as racially and culturally inferior and hence requiring guardianship by the members of Congress. Newton, *Federal Power over Indians: Its Sources, Scope, and Limitations*, 132 U.Pa.L.Rev. 195, 218 (1984). The plenary power doctrine's effects on the rights of Indians have been deemed so devastating as to prompt one judge to refer to the day that the opinion in *Lone Wolf* was issued and the doctrine of plenary power developed as "one of the blackest days in the history of the American Indian, the Indians' Dred Scott decision." *Sioux Nation of Indians v. United States*, 601 F.2d 1157, 1173, 220 Ct.Cl. 442 (1979) (Nichols, J., concurring).

■ As disturbing as application of the *Lone Wolf* principle may be, however, lower federal district courts are bound by decisions of the Supreme Court. Thus, this Court is bound by the Supreme Court's clear rulings that Congress may pass laws such as the gaming legislation even if they violate treaties with the Indians or Indians' aboriginal rights. The Indians claims to the contrary must therefore be rejected.

Other case law cited by plaintiffs in support of their view that the Act in question unlawfully violated their rights is inapposite. Plaintiffs attempt to rely on the legal doctrine that federal statutes must be construed to facilitate the retention of Indian rights to self-government preserved by statute. *See, e.g., Muscogee (Creek) Na-*

*tion v. Hodel*, 851 F.2d 1439, 1444–45 (D.C. Cir.1988), *cert. denied*, 488 U.S. 1010, 109 S.Ct. 795, 102 L.Ed.2d 786 (1989). However, this doctrine provides no authority for striking down such Congressional acts when they deliberately reduce Indian rights to self-government. Similarly, case law presented by plaintiffs that prohibit state encroachment on Indian sovereignty, *see, e.g., New Mexico v. Mescalero Apache Tribe*, 462 U.S. 324, 332, 103 S.Ct. 2378, 2385, 76 L.Ed.2d 611 (1983), is not applicable to the situation presented here, where Congress, itself, has encroached upon the Indians' sovereignty. Consequently, defendant's motion to dismiss must be granted as to Counts I–IV.

### B.

Plaintiffs also assert that the Gaming Act violates Congress' federal trust responsibility to the Indians. Plaintiffs contend that Congress passed the Act because of pressure from non-Indian gambling ventures seeking to gain advantage over Indian competition. The government moves to dismiss this claim on the ground that Congress' actions violate no federal trust responsibility, citing *United States v. Mitchell*, 445 U.S. 535, 100 S.Ct. 1349, 63 L.Ed.2d 607 (1983) ("*Mitchell I*"), *on remand*, 664 F.2d 265, 229 Ct.Cl. 1 (1981), *aff'd*, 463 U.S. 206, 103 S.Ct. 2961, 77 L.Ed.2d 580 (1983) ("*Mitchell II*"). Specifically, the government argues that both *Mitchell I* and *Mitchell II* establish that the existence of a general trust relationship, absent the presence of specific statutes, is not sufficient to give rise to specific, actionable, fiduciary duties. Because no statute imposes a trust duty to protect tribal sovereignty over gaming from interference by the states or the federal government, defendants contend, this claim must be dismissed.

■ Contrary to defendant's contention, however, both *Mitchell I* and *Mitchell II* specifically dealt with the question of whether the government could be held to the standards of a trustee and therefore be held liable for money damages as a result of its mismanagement of land. The Supreme Court based its inquiry on whether

the Indian General Allotment Act of 1887, 25 U.S.C. §§ 331–48, and various other statutes, created an express trust for the benefit of the Indians. *Mitchell I* explicitly distinguished the fiduciary obligations created by statute that would entitle the plaintiff to money damages from the obligations created by the "special relationship" between the United States and Indian tribes. 445 U.S. at 546 n. 7, 100 S.Ct. at 1355 n. 7. The Court specifically stated that it would not reach the latter issue in that case. *Id.* Similarly, in *North Slope Borough v. Andrus*, 642 F.2d 589 (D.C.Cir.1980), our court of appeals left open the question of whether the "special relationship" between the United States and Indian tribes in that case imposed specific fiduciary duties on the government that could render it liable for money damages even though no statutes specifically imposed trusteeship duties on the Government. *Id.* at 611 n. 148. Thus, the mere absence of specific statutes imposing a trust obligation with respect to the Indian tribes' right to self-government does not bar a claim seeking declaratory and injunctive relief on the ground that Congress has violated its special obligation to the Indians.

■ Our circuit court has recently reemphasized the principle that "Congress' power.... '[is] subject to limitations inhering in .... a guardianship.'" *Littlewolf v. Lujan*, 877 F.2d 1058, 1063 (D.C.Cir.1989) (quoting *United States v. Sioux Nation of Indians*, 448 U.S. 371, 415, 100 S.Ct. 2716, 2740–41, 65 L.Ed.2d 844 (1980)). Although traditionally courts enforced trusteeship duties only against officers of the executive branch and considered Congress' trust obligations to derive merely from a moral obligation to deal with the Indians in good faith, the Supreme Court in recent years has laid to rest any notion that Congress' decisions regarding the Indian tribes are not reviewable. *See Littlewolf v. Lujan*, 877 F.2d at 1064; *see, e.g., Delaware Tribal Business Comm. v. Weeks*, 430 U.S. 73, 84, 97 S.Ct. 911, 918, 51 L.Ed.2d 173 (1977). According to our court of appeals, the test of the legitimacy of a Congressional enactment with regard to the special relationship between Congress and the Indians, as with

that for testing the constitutionality of the legislation, is "whether Congress' exercise of its plenary power was reasonably related to its trust responsibility to the [Indians]." *Littlewolf*, at 1064; *see also Delaware Tribal Business Comm. v. Weeks*, 430 U.S. at 85, 97 S.Ct. at 919. It is against these standards that the Gaming Act must be measured.

Plaintiffs begin with a heavy burden in challenging the Gaming Act. Congress' role as the policymaking branch of the federal government creates a presumption of legitimacy for congressional Acts. *Littlewolf*, at 1063 (citing *Rostker v. Goldberg*, 453 U.S. 57, 64, 101 S.Ct. 2646, 2651, 69 L.Ed.2d 478 (1981)). The general deference due to Congress' decisions is reinforced by Congress' careful balancing of the competing interests reconciled by the Gaming Act, as indicated by the Act's legislative history. *Id.* The Senate Report on the bill that became the Act reflects concern for the "potential for the infiltration of organized crime or criminal elements in Indian gaming activities." S.Rep. 446, 100th Cong., 2d Sess. 5 (1988), U.S.Code Cong. & Admin. News 1988, p. 3075. In reacting to this concern, the legislative history indicates that Congress considered "how best to preserve the right of tribes to self-government while, at the same time, to protect both the tribes and the gaming public from unscrupulous persons." *Id.* at 1–2, (1988), U.S. Code Cong. & Admin.News 1988, p. 3071 (attached as Ex. 1 to defendant's reply). Specifically, the legislative history demonstrates that Congress considered the Indians' "governmental interests includ[ing] raising revenues to provide governmental services for the benefit of the tribal community and reservation residents, promoting public safety as well as law and order on tribal lands, realizing the objectives of economic self-sufficiency and Indian self-determination, and regulating activities of persons within its jurisdictional borders." *Id.* at 13, U.S.Code Cong. & Admin.News 1988, p. 3083. After deliberation, Congress reached the conclusion that the compact process ultimately settled on "is the best

mechanism to assure that the interests of both sovereign entities are met...." *Id.*

On the basis of the legislative history, summary judgment is appropriate on this claim. The Supreme Court itself has stated that the possibility that "tribal games are attractive to organized crime" would be one that would authorize "the Federal Government ... to forbid Indian gambling enterprises." *California v. Cabazon Band of Mission Indians*, 480 U.S. 202, 221, 107 S.Ct. 1083, 1094, 94 L.Ed.2d 244 (1987). Although plaintiffs argue that the Act was not needed to protect Indian tribes from infiltration by organized crime, in the Supreme Court's words, issues of legislative or public policy are "better addressed to the wisdom of Congress than to the judgment of [c]ourt[s]." *Miller v. Youakim*, 440 U.S. 125, 141 n. 21, 99 S.Ct. 957, 967 n. 21, 59 L.Ed.2d 194 (quoting *Marquette Nat'l Bank v. First of Omaha Serv. Corp.*, 439 U.S. 299, 99 S.Ct. 540, 58 L.Ed.2d 534 (1978)); *see also Walters v. National Ass'n of Radiation Survivors*, 473 U.S. 305, 319–20, 105 S.Ct. 3180, 3188–89, 87 L.Ed.2d 220 (1985). Accordingly, defendant must prevail on plaintiff's claim that the Gaming Act violates Congress' special relationship with the Indians.

### C.

■ Plaintiffs also argue that the Act unconstitutionally interferes with the Indian tribes' fundamental right to self-government in violation of the due process clause of the Fifth Amendment to the United States Constitution. Plaintiffs contend that Congress passed the Act without attempting to consider the interests of the Indians. Memorandum of Opposing Points and Authorities to Defendant's Motion to Dismiss (Sept. 22, 1989) ("Plaintiffs' Opposition"), at 15. They contend that the Act was passed because non-Indian gambling organizations pressured Congress to protect their interests and because prejudice against the Indians influenced the congressional vote. The government, in response, argues that Congress passed the Act to shield the Indians from criminal or corrupting influences and that the Act does not violate the due process clause.

Although plaintiffs request application of strict scrutiny to the alleged deprivation of due process, the Supreme Court in *Washington v. Yakima Indian Nation*, 439 U.S. 463, 501, 99 S.Ct. 740, 761, 58 L.Ed.2d 740 (1979), stated that the right to self-determination must be evaluated under rational relation scrutiny because "[i]t is well established that Congress, in the exercise of its plenary power over Indian affairs, may restrict the retained sovereign powers of the Indian tribes." *Id.* Under the rational relation test set out in *Morton v. Mancari*, 417 U.S. 535, 94 S.Ct. 2474, 41 L.Ed.2d 290 (1974), "[a]s long as the special treatment can be tied rationally to the fulfillment of Congress' unique obligation toward the Indians, such legislative judgments will not be disturbed." *Id.* at 555, 94 S.Ct. at 2485; *see also Littlewolf v. Lujan*, 877 F.2d at 1064. Because Congress could reasonably address the concern of infiltration of organized crime into Indian gaming through passage of the Act, and in this way fulfill its unique obligation to the Indians, as indicated *supra* Part C, plaintiff's claim that the Act violates the due process guarantee fails.

### D.

■ Finally, plaintiffs argue that the statutory scheme of the Act violates Article III of the Constitution, which defines the judicial power of federal courts. The Act provides for federal court jurisdiction in cases in which either an Indian tribe or a state has failed to enter into negotiation of a tribal-state compact in good faith. Judicial relief, however, is limited to ordering the parties to conclude a compact within sixty days and, failing agreement after that time, to submit the dispute to a court-appointed mediator. Plaintiffs argue that, by restricting the remedies available to courts in this manner, the Act denies the courts its constitutional function of resolving "cases or controversies." According to plaintiffs, "[w]ithout the availability of judicial relief, the case lacks justiciability." Plaintiffs' Opposition at 40. Defendant disputes this contention.

The claim that the Constitution's limitation of the judicial power to cases or controversies prohibits federal courts from hearing cases in which a full panoply of remedies is not available has long since been disposed of by the Supreme Court, however. In *Aetna Life Ins. Co. v. Haworth*, 300 U.S. 227, 57 S.Ct. 461, 81 L.Ed. 617 (1937), the Supreme Court upheld the constitutionality of the Declaratory Judgment Act, which gives the federal courts power to declare rights "whether or not further relief is or could be prayed." 28 U.S.C. § 400. According to the Supreme Court,

> [i]n providing remedies and defining procedure in relation to cases and controversies in the constitutional sense the Congress is acting within its delegated power over the jurisdiction of the federal courts which the Congress is authorized to establish. Exercising this control of practice and procedure the Congress is not confined to traditional forms or traditional remedies. The judiciary clause of the Constitution "did not crystallize into changeless form the procedure of 1789 as the only possible means for presenting a case or controversy otherwise cognizable by the federal courts." *Nashville, Chattanooga & St. Louis R. Co. v. Wallace*, 288 U.S. 249, 264 [53 S.Ct. 345, 348, 77 L.Ed. 730 (1933)]. In dealing with methods within its sphere of remedial action the Congress may create and improve as well as abolish or restrict.

300 U.S. at 240, 57 S.Ct. at 463 (citations omitted). In this case, the Gaming Act falls well within the ambits of constitutional power. The Act therefore does not present to the courts cases lacking justiciability.

Plaintiffs also argue that the Act's statutory scheme must be struck down because it requires federal courts to adjudicate political questions. Plaintiffs argue that resolution of tribal-state disputes over proposed compacts will turn on policy determinations by states, tribal governments, and federal branches of government that may not be adjudicated in federal court. Plaintiffs' Opposition, at 42; *see Baker v. Carr*, 369 U.S. 186 at 217, 82 S.Ct. 691 at 710, 7 L.Ed.2d 663 (1962). Plaintiffs also contend that no judicially discoverable and manageable standards would allow the judiciary to properly adjudicate this dispute.

According to the Act, however, the role of a district court is to apply a bad faith standard to the negotiations and to order the parties to conclude a compact in good faith. Neither of these actions would involve the judiciary in policy determinations "of a kind clearly for nonjudicial discretion." *Baker v. Carr*, 369 U.S. at 217, 82 S.Ct. at 710. Moreover, presentation of the issue of whether compact negotiations were entered in bad faith does not present "a lack of judicially discoverable and manageable standards for resolving it." *Id.* Instead, resolution of this issue involves the type of factfinding for which Article III courts are competent to handle. Consequently, plaintiffs' claim that the Act presents a non-justiciable political question to courts must be dismissed.

### III.

Because plaintiffs have failed to meet their burden of pleading or proof on each count, the accompanying Order grants defendant's motion to dismiss and dismisses the above-captioned complaint.