**NARRAGANSETT INDIAN TRIBE, Appellant,**

v.

**NATIONAL INDIAN GAMING COMMIS-SION and Tadd Johnson, in his official capacity as Chairman of the National Indian Gaming Commission, Appellees.**

No. 97–5290.

United States Court of Appeals,
District of Columbia Circuit.

Argued Sept. 2, 1998.

Decided Oct. 27, 1998.

Charles A. Hobbs argued the cause for appellant. With him on the briefs was Joseph H. Webster.

Marta Hoilman, Attorney, U.S. Department of Justice, argued the cause for appellees. With her on the brief were Lois J. Schiffer, Assistant Attorney General, David C. Shilton and Edward J. Passarelli, Attorneys.

Patrick J. Kennedy, appearing pro se, was on the brief for amicus curiae Patrick J. Kennedy, United States Congressman, House of Representatives.

William J. Rodgers and Joseph S. Larisa, Jr., were on the brief for amicus curiae Lincoln C. Almond, Governor of Rhode Island. Thomas A. Thompson entered an appearance.

Before: WALD, WILLIAMS and TATEL, Circuit Judges.

TATEL, Circuit Judge:

Relying on the equal protection guarantees of the Fifth Amendment, the Narragansett Indian Tribe of Rhode Island challenges the constitutionality of legislation, known as the Chafee Amendment, that prohibits the National Indian Gaming Commission from authorizing gambling on Narragansett lands. We agree with the district court that far from illegitimately singling out the Narragansetts for discriminatory treatment, the Chafee Amendment represents a rational interpretation of an earlier agreement among the Tribe, the State of Rhode Island, and the federal government that state law, including state gambling law, would govern tribal lands.

I

The Narragansetts, aboriginal inhabitants of what is now Rhode Island, enjoyed cordial early relations with English settlers on Roger Williams's Providence Plantation. See WILLIAM G. McLOUGHLIN, RHODE ISLAND 4–5, 9–10 (1978). During the latter part of the 17th century, the Tribe was drawn into bloody warfare with Puritan colonists seeking to gain political authority over much of Rhode Island by securing claims to Indian land. Id. at 40–44. Surviving members of the Tribe banded together with other Indians in the early 1700s to form a Narragansett Indian community in present-day Charlestown. Id. at 44–45.

Although for most of the next century the Narragansetts resisted Rhode Island's efforts to extinguish their tribal identity and confer State citizenship, in 1880 the Tribe agreed to abolish tribal authority and to sell (for $5,000) all but two acres of its reservation. See id. at 221. Concluding almost immediately that they had made a mistake, the Narragansetts began a century-long effort to recover their tribal lands, an effort that culminated in the mid–1970s when the Tribe settled litigation it had brought against the State and private landowners in which it claimed that the 1880 land sale violated the

Indian Nonintercourse Act, *see* Act of June 30, 1834, ch. 161, § 12, 4 Stat. 730 (prohibiting land conveyances from Indian tribes to non-Indians unless "made by treaty or convention entered into pursuant to the constitution"). The settlement, contained in a Joint Memorandum of Understanding ("JMOU"), provided for the transfer of 1,800 acres of land to a corporation formed to hold the land in trust for the benefit of "the descendants of the 1880 Rhode Island Narragansett Roll," in exchange for extinguishment of the Narragansetts' land title claims. JMOU ¶¶ 2, 3, 6, 8. The JMOU also provided that "the laws of the State of Rhode Island shall be in full force and effect" on Narragansett settlement lands, with the exception of hunting and fishing regulation and local property taxation. JMOU ¶¶ 9, 11, 13. Congress then implemented the JMOU by enacting the Rhode Island Indian Claims Settlement Act. Pub.L. No. 95–395, 92 Stat. 813 (1978) (codified at 25 U.S.C. §§ 1701–16 (1994)). As the parties to the JMOU had agreed, the Settlement Act specifically stated that Narragansett settlement lands are "subject to the civil and criminal laws and jurisdiction of the State of Rhode Island." 25 U.S.C. § 1708(a). With the enactment of this statute, the Narragansetts joined a growing number of Indian tribes that have reclaimed tribal lands after legislative settlements of aboriginal land claims.

In 1988, Congress enacted the Indian Gaming Regulatory Act, Pub.L. No. 100–497, 102 Stat. 2467 (1988) (codified at 25 U.S.C. §§ 2701–21) ("IGRA"), precipitating the explosion of Indian reservation gambling and the Narragansett Tribe's journey to this court. Dividing gambling activities into three classes, IGRA makes Class II gaming, which includes bingo, subject to regulation by the National Indian Gaming Commission, appellee in this case. 25 U.S.C. § 2710(b). Although the Act permits federally recognized tribes to apply for Commission approval of gaming proposals, an early version of IGRA contained a provision specifically excluding the Narragansetts. Offered by Senators Chafee and Pell of Rhode Island to ensure that IGRA conformed to the Settlement Act's state law proviso, the Narragansett exclusion provided that "[n]othing in this Act may be construed as permitting gaming activities, except to the extent permitted under the laws of the State of Rhode Island, on lands acquired by the Narragansett Indian Tribe under the Rhode Island Indian Claims Settlement Act." S. 555, 100th Cong. § 23, 134 CONG. REC. 24,022 (1988). After Congressman Udall, chairman of the House Interior Committee, announced that he would oppose the bill if it contained the Narragansett exclusion, *see Narragansett Indian Tribe: Oversight Hearing Before the House Comm. on Resources*, 105th Cong. 65 (1997) (statement of Frank Ducheneaux, attorney), Senators Chafee and Pell moved to delete the section, engaging in the following colloquy with Senator Inouye, chairman of the Senate Committee on Indian Affairs:

> Mr. PELL. . . . In the interests of clarity, I have asked that language specifically citing the protections of the Rhode Island Claims Settlement Act (Public Law 95–395) be stricken from S. 555. I understand that these protections clearly will remain in effect.

> Mr. INOUYE. I thank my colleague, . . . and assure him that the protections of the Rhode Island Indian Claims Settlement Act (P.L. 95–395), will remain in effect and that the Narragansett Indian Tribe clearly will remain subject to the civil, criminal, and regulatory laws of the State of Rhode Island.

> Mr. CHAFEE. . . . The chairman's statement makes it clear that any high stakes gaming, including bingo, in Rhode Island will remain subject to the civil, criminal, and regulatory laws of our State.

134 CONG. REC. 24,023 (1988).

Following the passage of IGRA minus the Narragansett exclusion, the Tribe initiated steps to operate a gambling establishment on tribal lands. Seeking to stop the Tribe, the State sued, alleging that nothing in IGRA supplanted the understanding of the parties, as reflected in the JMOU and the Settlement Act, that state law, including state gambling regulations, governed Narragansett settlement lands. The First Circuit ruled for the Tribe. *See Rhode Island v. Narragansett Indian Tribe*, 19 F.3d 685 (1st Cir.1994). It

held that although the Tribe's lands remained subject to the State's general jurisdiction under the Settlement Act, IGRA had implicitly repealed the Settlement Act's grant of state jurisdiction with respect to gambling regulation. *Id.* at 703–05. The court discounted the Senators' colloquy, finding it at odds with the statute's language, which contained no exception for the Narragansetts. *Id.* at 699. In dissent, Judge Coffin disagreed with the majority's interpretation of IGRA, concluding: "If, of course, the Congress were to feel that an injustice had been done to [Rhode Island], it could provide a remedy through supplemental legislation." *Id.* at 708 (Coffin, J., dissenting).

Armed with its First Circuit victory, the Tribe sought approval from the National Indian Gaming Commission to open a bingo hall. Congress, responding to Judge Coffin's suggestion, amended the Settlement Act to make clear that IGRA had not preempted its grant of state jurisdiction. Sponsored by Senator Chafee, the two-line amendment provides: "For purposes of the Indian Gaming Regulatory Act (25 U.S.C. § 2701 et seq.), settlement lands shall not be treated as Indian lands." Pub.L. No. 104–208, 110 Stat. 3009–227 (1996) (codified at 25 U.S.C.A. § 1708(b) (West Supp.1998)). Senator Chafee explained, "It is our determined view that a deal is a deal." *Narragansett Indian Tribe: Oversight Hearing Before the House Comm. on Resources,* 105th Cong. 14 (1997) (statement of Sen. Chafee) ("Chafee Testimony").

· Following enactment of the Chafee Amendment, the Commission disapproved the Tribe's proposal. The Tribe then sued the Commission in the United States District Court for the District of Columbia. Arguing that the Chafee Amendment violates both equal protection guarantees and separation of powers and that it amounts to a bill of attainder, the Tribe sought declaratory and injunctive relief requiring the Commission to complete its regulatory review of the Tribe's bingo hall proposal. The district court rejected all of the Tribe's arguments and granted summary judgment to the Commission, holding with respect to the Tribe's equal protection claim that "[t]he Court can-

not say that the congressional choice does not reasonably support Congress' decision to amend the Settlement Act to remedy IGRA's unintended preemption of state jurisdiction over the Settlement Lands." *Narragansett Indian Tribe v. National Indian Gaming Comm'n,* No. 97–334, slip op. at 18 (D.D.C. Aug. 19, 1997).

 Asserting only its equal protection challenge, the Tribe now appeals. Congressman Patrick Kennedy filed an amicus brief supporting the Tribe's equal protection claim and reiterating its separation of powers and bill of attainder arguments. Because we ordinarily do not entertain arguments not raised by parties, *see Michel v. Anderson,* 14 F.3d 623, 625 (D.C.Cir.1994), we consider only the Tribe's equal protection challenge. We review the district court's grant of summary judgment *de novo. See Tao v. Freeh,* 27 F.3d 635, 638 (D.C.Cir.1994).

## II

 We begin, as we must, with our jurisdiction. Section 1711 of the Settlement Act provides:

Notwithstanding any other provision of law, any action to contest the constitutionality of this subchapter shall be barred unless the complaint is filed within one hundred and eighty days of September 30, 1978. Exclusive jurisdiction over any such action is hereby vested in the United States District Court for the District of Rhode Island.

25 U.S.C. § 1711. The Chafee Amendment became section 1708(b) of "this subchapter."

 Not until the Commission filed its brief in this court did either party acknowledge section 1711's existence. In a footnote the Commission took the position that the Narragansetts' case was not time-barred because the Tribe filed it within 180 days of the Amendment's enactment. As to whether the Tribe should have filed its case in Rhode Island, the Commission was silent. After we asked the parties to address the jurisdictional implications of section 1711, the Tribe submitted a supplemental brief arguing that section 1711's restrictions applied only to challenges to the Settlement Act as originally

enacted in 1978. Although the Commission advised us at oral argument that it agreed, we have an independent responsibility to assess the jurisdictional issue ourselves. *See Houston Business Journal, Inc. v. Office of the Comptroller of the Currency*, 86 F.3d 1208, 1211 (D.C.Cir.1996).

Section 1711 lends itself to two possible interpretations. Applying normal rules of statutory construction that construe a later amendment as if it were part of the original act, *see* 1A SUTHERLAND'S STATUTORY CONSTRUCTION § 22.35 (4th ed.1985), we could interpret section 1711's first sentence (as the Commission suggested in its brief) to create a 180–day statute of limitations running from the date of enactment of any amendments. Viewed this way, the Tribe's suit was timely, but because it amounted to "any such action" within the meaning of section 1711's second sentence, the Tribe should have filed it in Rhode Island. The Narragansetts (now supported by the Commission) suggest an alternative interpretation: Because section 1711 requires the filing of constitutional challenges within 180 days of September 30, 1978, it could not possibly apply to challenges to amendments added years later. So interpreted, section 1711 would have no applicability to the Narragansetts' suit.

We find neither of these interpretations linguistically satisfying. The Commission's original view requires that we ignore Congress's use of the specific date, assuming that it meant not "within one hundred and eighty days of September 30, 1978," but rather within 180 days of passage of any subsequent amendment. The Narragansetts' interpretation requires that we assume that the phrase "any action to contest the constitutionality of this subchapter" means not "any" action, but rather just any action challenging the original Settlement Act.

■ Facing statutory ambiguity, we look to legislative purpose. *See Concrete Pipe & Prods., Inc. v. Construction Laborers Pension Trust*, 508 U.S. 602, 627, 113 S.Ct. 2264, 124 L.Ed.2d 539 (1993). According to the Settlement Act, its primary objective was "to remove all clouds on titles resulting from ... Indian land claims within the State of Rhode Island." 25 U.S.C. § 1701(c); *see also*

H.R.REP. No. 95–1453, at 15 (1978), *reprinted in* 1978 U.S.S.C.A.N.1948, 1958 ("[The Settlement Act] is intended to resolve once and for all the claims being asserted by the Narragansett Indians to lands in the Town of Charlestown...."). This suggests that Congress intended to ensure that any suits challenging the validity of the Settlement Act were brought quickly and heard by the court most familiar with the issues, i.e., the Rhode Island court that heard the land claim litigation that resulted in the JMOU. Reinforcing this interpretation, the Alaska Native Claims Settlement Act, upon which Congress modeled the Rhode Island Settlement Act, *see id.* at 8, 1978 U.S.S.C.A.N. at 1951, contains the same language as section 1711, adding: "The purpose of *this limitation* on suits is to insure that, after the expiration of a reasonable period of time, the right, title, and interest of the United States, the Natives, and the State of Alaska will vest with certainty and finality...." 43 U.S.C. § 1609(a) (1994) (emphasis added). Of course, section 1711 contains no such explanation. But because the section uses precisely the same jurisdictional language as the Alaska Settlement Act, and because the Rhode Island Settlement Act has essentially the same purpose, we think Congress intended section 1711's time and jurisdiction limitations likewise to apply only to constitutional suits challenging the original land settlement.

The Narragansetts' challenge to the Chafee Amendment is not such a suit. It neither revives the old land claims nor unsettles land titles. Instead, the suit challenges the action of the National Indian Gaming Commission, a federal agency located in the District of Columbia. We thus agree with the parties that section 1711 does not apply to this suit.

### III

The Narragansetts contend that the Chafee Amendment singles out the Tribe for unfair treatment in violation of the equal protection guarantees of the Fifth Amendment's Due Process Clause. *See Bolling v. Sharpe*, 347 U.S. 497, 74 S.Ct. 693, 98 L.Ed. 884 (1954). The Commission disagrees, arguing that the amendment simply remedies IGRA's unintentional preemption of the Settlement

Act's grant of state jurisdiction over tribal gaming activities.

■■■ The parties begin with a debate over the standard of review, although they agree that strict scrutiny does not apply. Neither suggests that gambling amounts to a fundamental right. *See Harper v. Virginia State Bd. of Elections*, 383 U.S. 663, 670, 86 S.Ct. 1079, 16 L.Ed.2d 169 (1966) (holding that strict scrutiny applies to classifications that burden fundamental rights). And because federal regulation of Indian tribes is "rooted in the unique status of Indians as 'a separate people' with their own political institutions," *United States v. Antelope*, 430 U.S. 641, 646, 97 S.Ct. 1395, 51 L.Ed.2d 701 (1977), the Supreme Court has long distinguished Indian classifications from suspect racial classifications, holding that " 'the unique legal status of Indian tribes under federal law' permits the Federal Government to enact legislation singling out tribal Indians, legislation that might otherwise be constitutionally offensive." *Washington v. Confederated Bands & Tribes of Yakima Indian Nation*, 439 U.S. 463, 500–01, 99 S.Ct. 740, 58 L.Ed.2d 740 (1979) (quoting *Morton v. Mancari*, 417 U.S. 535, 551–52, 94 S.Ct. 2474, 41 L.Ed.2d 290 (1974)). For these reasons, the Commission urges us to subject the Chafee Amendment to rational basis analysis.

The Tribe disagrees, arguing that ordinary rational basis scrutiny is insufficient for Indian classifications. It points out that Congress's plenary power over Indian tribes is tempered by its "trust obligation" toward Indians, an obligation anchored in the nation's history of federal dominance and Indian dependency. *See Mancari*, 417 U.S. at 552, 94 S.Ct. 2474. Within the context of this "trust relationship," the Narragansetts argue, equal protection rational basis scrutiny takes on a more focused, less deferential form. The Tribe relies on *Delaware Tribal Business Committee v. Weeks*, where the Supreme Court held that "[t]he standard of review ... is that the legislative judgment should not be disturbed '[a]s long as the special treatment can be tied rationally to the fulfillment of Congress' unique obligation towards the Indians.' " 430 U.S. 73, 85, 97 S.Ct. 911, 51 L.Ed.2d 173 (1977) (quoting

*Mancari*, 417 U.S. at 555, 94 S.Ct. 2474). Applying this more focused rational basis standard, the Narragansetts maintain that without articulating any purpose tied to the government's special obligation to Indians, Congress violated the Narragansetts' rights by excluding them from IGRA, thereby barring them from participating in federal Indian trust programs that would promote tribal economic development and self-sufficiency.

■■ We think the Tribe's reliance on *Weeks* is misplaced. In that case, the Court took the "unique obligation" language from *Mancari*, where the government advanced its interest in fulfilling its trust obligation as the justification for its challenged Indian employment preference policy. *See Mancari*, 417 U.S. at 555, 94 S.Ct. 2474. Accepting this interest as legitimate, *Mancari* merely applied ordinary rational basis analysis to determine whether the employment preference rationally related to the government's interest in fulfilling its trust obligation. As post-*Weeks* decisions have made clear, ordinary rational basis scrutiny applies to Indian classifications just as it does to other nonsuspect classifications under equal protection analysis. *See, e.g., Yakima*, 439 U.S. at 501–02, 99 S.Ct. 740 (relying on ordinary rational basis cases to uphold a state's partial assertion of jurisdiction over Indian lands).

To be sure, in *Littlewolf v. Lujan*, 877 F.2d 1058 (D.C.Cir.1989), this court noted *Weeks*'s "unique obligation" formulation, a reference upon which the Narragansetts rely. Although *Littlewolf* neither explored the questionable derivation of that language nor mentioned *Yakima*'s later holding that ordinary rational basis scrutiny applies, *see id.* at 1063–64, the court had no reason to do so. Like *Mancari*, *Littlewolf* involved circumstances in which Congress, in passing the challenged legislation, claimed to be fulfilling its trust relationship; the legislation thus passed muster even under *Weeks*. Moreover, a more recent Circuit precedent specifically reads *Weeks* as requiring only that the government articulate a "rational basis" or "some reasoned explanation" for creating an Indian classification. *See Cherokee Nation v. Babbitt*, 117 F.3d 1489, 1502 (D.C.Cir.1997).

To prevail on their equal protection claim, therefore, the Narragansetts must demonstrate that Congress's exclusion of the Tribe from IGRA has no rational relationship to any legitimate purpose. *See City of Cleburne v. Cleburne Living Ctr., Inc.,* 473 U.S. 432, 440, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985). The record does not support such a claim.

■ To begin with, the Narragansetts are not the only tribe excluded from IGRA and subjected instead to state gaming law. The Catawba Indians, the Passamoquoddy Tribe and Penobscot Nation, and the Wampanoag Tribal Council of Gay Head have also regained lands through legislative settlements in which they accepted general state jurisdiction over tribal lands. *See* 25 U.S.C. § 941b(e), m(c); *id.* § 1725(h); *id.* § 1771g. The Catawba Indians' and the Wampanoag Tribal Council's settlement acts specifically provide for exclusive state control over gambling. *See id.* § 941*l*(a); *id.* § 1771g.

Moreover, although the deletion of the Narragansett exclusion from IGRA and the explanatory colloquy among Senators Chafee, Pell, and Inouye created a certain degree of ambiguity regarding IGRA's applicability to Narragansett lands, Congress's belief that the Tribe had originally agreed to state control can hardly be considered irrational. After all, the JMOU, which the Tribe signed, specifically provides that with the exception of laws governing hunting, fishing, and property taxes, *"all* laws of the State of Rhode Island shall be in full force and effect on the Settlement Lands." JMOU ¶ 13 (emphasis added). The Settlement Act likewise assured Rhode Island that "settlement lands shall be subject to the civil and criminal laws and jurisdiction of the State of Rhode Island." 25 U.S.C. § 1708(a). It was thus not surprising that when the First Circuit held that IGRA implicitly repealed the Settlement Act with respect to gambling, Congress promptly enacted the Chafee Amendment to, in the words of its sponsor, "restore[ ] the integrity of the Rhode Island Indian Claims Settlement Act and uph[o]ld the primacy of State jurisdiction over the Tribe's settlement lands." Chafee Testimony at 14. Reflecting precisely the same understanding of the Set-

tlement Act, Senator Pell said, "As one who worked in [sic] the Settlement Act, I know that the intent of this law was to preserve the full jurisdiction of the State of Rhode Island. That's why 10 years later we entered into a colloquy to assure that the Indian Gaming Regulatory Act would not supersede the Settlement Act." *Indian Gaming Regulatory Act: Oversight Hearing Before the Senate Comm. on Indian Affairs,* 103d Cong. 8–9 (1994) (statement of Sen. Pell). The Governor of Rhode Island (the State had also signed the JMOU) expressed the same understanding of the Settlement Act: "[The Pell/Inouye/Chafee] colloquy was intended by all parties to make clear the fact that nothing in the Indian Gaming Regulatory Act was going to preempt what had already been established 10 years earlier in 1978, by the Rhode Island Indian Claims Settlement Act." *Id.* at 32–33 (statement of Gov. Sundlun). As the Tribe concedes, excluding from IGRA those tribes that have specifically agreed to state gambling regulation is an "appropriate" governmental purpose. *See* Reply Br. at 11.

■ The Narragansetts offer an alternative argument to support their claim that Congress acted irrationally when it added the Chafee Amendment to the Settlement Act. Pointing out that both the JMOU and the Settlement Act predate the Tribe's 1983 federal recognition and its conveyance of tribal lands to the Bureau of Indian Affairs in trust, the Narragansetts claim that Congress could not legitimately have viewed either the JMOU or the Settlement Act as reflecting tribal agreement to state control *after* federal recognition. Federal recognition and federal land trusteeship ordinarily have the effect of making tribal land "Indian country" subject to federal law, not state law. *See* F. COHEN, HANDBOOK OF FEDERAL INDIAN LAW 35–36, 348–49 (1982). Because the JMOU and the Settlement Act are silent as to the effect of federal recognition and trusteeship on the grant of state jurisdiction, and because neither mentions state jurisdiction over Indian gaming, the Tribe urges us to apply what it characterizes as the "Indian canon of construction" and interpret this silence "liberally ..., [with] doubtful expressions being resolved in favor of the Indians."

**1342**

*Bryan v. Itasca County,* 426 U.S. 373, 392, 96 S.Ct. 2102, 48 L.Ed.2d 710 (1976) (internal quotation omitted).

Although intriguing, the Tribe's argument is ultimately unavailing. Even if the Tribe were correct that the JMOU and the Settlement Act implicitly contemplated that state jurisdiction would end whenever it obtained federal recognition, Congress could rationally have reached the opposite conclusion. The grants of state jurisdiction contained in the JMOU and the Settlement Act are unconditional, saying nothing about eventual federal recognition. The Chafee Amendment thus represents a rational exercise of congressional authority to enforce the terms of the original agreement by which the Narragansetts regained tribal lands. In any event, the First Circuit has already rejected the Tribe's argument that federal recognition altered the original jurisdictional grant to Rhode Island. *See Narragansett Indian Tribe,* 19 F.3d at 695 (observing that "at every salient moment, the parties in interest took pains to reaffirm section 1708['s grant of state jurisdiction]"). Having lost in the First Circuit, the Narragansetts may not relitigate the issue here. *See SEC v. Bilzerian,* 29 F.3d 689, 693 (D.C.Cir.1994) ("The doctrine of collateral estoppel prohibits relitigation of an issue of fact or law that has been decided in an earlier litigation.").

We affirm the district court's grant of summary judgment for the Commission.

*So ordered.*