# United States Court of Appeals
### FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Argued January 11, 2016         Decided March 22, 2016

No. 15-7002

B.D., A MINOR, BY AND THROUGH HIS PARENTS AND NEXT
FRIENDS, ANNE AND BRANTLEY DAVIS, ET AL.,
APPELLANTS

v.

DISTRICT OF COLUMBIA,
APPELLEE

———

Appeal from the United States District Court
for the District of Columbia
(No. 1:12-cv-00934)

———

*Diana M. Savit* argued the cause and filed the briefs for appellants.

*Allen R. Snyder* and *Jennifer Ancona Semko* were on the brief for *amici curiae* Children's Law Center and Council of Parent Attorneys and Advocates, Inc. in support of appellants.

*Richard S. Love*, Senior Assistant Attorney General, Office of the Attorney General for the District of Columbia, argued the cause for appellee. With him on the brief were *Karl A. Racine*, Attorney General, *Todd S. Kim*, Solicitor General, and *Loren L. AliKhan*, Deputy Solicitor General.

Before: TATEL and MILLETT, *Circuit Judges*, and EDWARDS, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* TATEL.

Concurring opinion filed by *Circuit Judge* MILLETT.

TATEL, *Circuit Judge*: This case concerns a family's efforts to enforce a child's right under the Individuals with Disabilities Education Act (IDEA) to a "free appropriate public education," or "FAPE." In administrative proceedings, a hearing officer determined that the District of Columbia Public Schools (DCPS) had denied the child a FAPE and ordered limited compensatory education. The parents sued, challenging the adequacy of the compensatory education award. They also sought to enforce other portions of the Hearing Officer's Decision that were favorable to them, as well as to require the District to secure a therapeutic residential placement. The district court granted summary judgment for the District. For the reasons set forth below, we affirm in part, reverse in part, and remand for further proceedings consistent with this opinion.

## I.

"Congress enacted IDEA . . . to ensure that all children with disabilities are provided a free appropriate public education which emphasizes special education and related services designed to meet their unique needs [and] to assure that the rights of [such] children and their parents or guardians are protected." *Forest Grove School District v. T.A.*, 557 U.S. 230, 239 (2009) (alterations in original) (internal quotation marks and footnote omitted). In service of this goal, the statute requires school districts in states receiving IDEA funds to provide all resident children, including those requiring special-education services, with a "free appropriate public

education." 20 U.S.C. § 1412(a)(1)(A); *see Forest Grove*, 557 U.S. at 232.

Due to a variety of documented learning and other disabilities, DCPS has provided B.D., the son of Anne and Brantley Davis, with special-education services since at least the fall of 2006. In June 2009, B.D.'s new individualized education plan (IEP) reported substantial regression and recommended a change from the school he had attended for three years. For the next two school years, B.D.'s program, provided outside the school setting, "consisted of 21 hours of service per week, including tutoring, speech, counseling services and occupational therapy." Hearing Officer Determination (HOD) at 6. In the fall of 2011, B.D. enrolled at District expense at the Katherine Thomas School, a private special-education school located in Maryland. Although B.D.'s 2009 IEP remained his most recent, *see id.* at 19, the Katherine Thomas School planned to provide a one-on-one aide, and, on a weekly basis, 26.5 hours of specialized instruction, two hours of speech-language therapy, three hours of occupational therapy, and two hours of counseling.

Problems with this placement quickly became apparent. After a month or so, the school determined that it was unable to "meet [B.D.'s] present emotional and behavioral needs." Letter from Cathleen Burgess, Katherine Thomas School, to Ben Persett, DCPS. A report from the school identified issues including disruptive and unsafe behavior. This report also provided summaries of B.D.'s academic baselines, though the precision of these assessments was limited by B.D.'s lack of cooperation. Record evidence reveals not only that B.D. made no meaningful educational progress at the Katherine Thomas School, *see* Katherine Thomas School Report at 3 (noting that B.D. participated in only 27% of academic class time), but also that he regressed in a number of ways. For example, he

grew more compulsive and less able to tolerate the amount of services he had been receiving prior to his stint at Katherine Thomas. Hearing Tr. at 67–69 (Feb. 29, 2012); HOD at 8.

In October 2011, shortly after B.D. left the Katherine Thomas School, DCPS held an IEP meeting. Although B.D.'s mother attended, she chose not to participate because she believed DCPS lacked sufficient information or assessments to produce a meaningful IEP. The resulting IEP called for the same specialized services B.D. had been receiving at the Katherine Thomas School, all to be provided outside the general education environment. DCPS also proposed enrolling B.D. at the Children's Guild, another private special-education school.

Objecting to the IEP and proposed placement, the Davises chose to provide limited in-home tutoring and occupational therapy at their own expense. Although the Davises would have liked to provide additional tutoring and other services—such as psychological counseling—that B.D.'s IEP called for, they were unable to do so because of a lack of funds, as well as concerns over B.D.'s ability to tolerate and benefit from additional services. Hearing Tr. at 65–72 (Feb. 29, 2012).

Meanwhile, the Davises retained a psychologist to evaluate B.D. After examining the child, the psychologist expressed a "strong professional opinion that [B.D.] is not presently ready to be placed in an educational setting." Report of Dr. Gladys Sweeney at 5. She recommended that assessment of B.D.'s needs would be best accomplished in a "therapeutic in-patient treatment facility, where he can be observed, and treated." *Id.* at 6. A short time later, the Davises informed DCPS that Meridell Achievement Center, a residential treatment center in Texas, had accepted B.D. An

IEP meeting followed, at which all participants, including B.D.'s mother, agreed that they needed an updated assessment. The Davises requested placement at Meridell in large part to obtain this assessment, but DCPS took the position that such action was not "on the table right now." IEP Meeting Tr. at 40 (Nov. 29, 2011). Instead, DCPS suggested a referral to the Department of Mental Health to consider placement at a psychiatric residential treatment facility. This referral was sent on December 19.

About a month later, frustrated by the lack of progress, the Davises filed an administrative complaint. *See* 20 U.S.C. § 1415(f) (laying out applicable procedures). After receiving testimony and documentary evidence, the Hearing Officer ruled that DCPS had denied B.D. a FAPE from August to October 2011, which included B.D.'s time at Katherine Thomas, "by failing to provide [him] with an IEP or an appropriate educational setting." HOD at 20. The Hearing Officer further held that DCPS had continued to deny B.D. a FAPE for the five-month period beginning with the district's adoption of the October 2011 IEP and ending on the date of the Hearing Officer's Decision because: (1) "the IEP team did not rely on sufficient evaluative data" in producing the October 2011 IEP; (2) the Children's Guild was not an appropriate placement for B.D.; (3) the October 2011 IEP failed to adequately specify B.D.'s current level of academic performance; and (4) "the goals in the IEP do not contain baselines and are not measurable." *Id.* at 23.

Turning to the question of remedy, and finding that the Davises had acted appropriately in hiring a tutor and occupational therapist, the Hearing Officer ordered DCPS to reimburse the Davises for their costs. *Id.* at 23–24. He also awarded B.D. five hours per week of "intensive occupational therapy" for three months as compensatory education, *id.* at

24–26—a type of remedy aimed at putting a student in the educational position he would be in absent a FAPE denial. *Reid ex rel. Reid v. District of Columbia*, 401 F.3d 516, 524 (D.C. Cir. 2005) (describing the standards governing compensatory education awards). In doing so, the Hearing Officer credited testimony that the occupational therapy would help B.D. unlearn some of the negative behaviors that began or worsened while he was at the Katherine Thomas School. HOD at 24–26. The Hearing Officer, however, declined to award further compensatory education in the form of other services from the same facility, finding that "[n]one of these services are adequately explained on the record" and that "[t]here is nothing in the record to indicate how such services might meet the [applicable] standard of putting the Student in the same place as he would have been [if] he [had] not been denied a FAPE." *Id.* at 26. The Hearing Officer also rejected the Davises' request for a temporary placement at Meridell.

Acknowledging the need for further assessments, the Hearing Officer ordered the IEP team to "immediately reconvene" to "determine which assessments are necessary to: 1) determine antecedents to [B.D's] behavior in school and 2) . . . develop a behavioral plan that would allow [B.D.] to attend school." *Id.* at 31. The Hearing Officer also ordered the IEP team to "determine appropriate services for [B.D.] to receive until assessments are completed," including "1:1 home instruction for two hours per day, five days a week." *Id.* The Officer ordered that the relevant assessments be completed within sixty days, and that the IEP team meet within ten days of their completion "to review the assessments and create an educational program for [B.D.]." *Id.* The Hearing Officer, however, imposed no compensatory education obligations on DCPS beyond the five hours per week of occupational therapy for three months.

Soon after the Hearing Officer issued his decision, the IEP team convened and authorized speech-language, occupational therapy, and social history assessments, as well as a records-based psychological assessment. DCPS authorized the Davises to secure the ordered occupational therapy and tutoring at specified rates. After completion of the assessments, the IEP team took several actions, including producing a new IEP, albeit some time after the deadline set out in the Hearing Officer's Decision. *See generally* IEP Meeting Tr. (June 8, 2012); July 2012 IEP. This IEP called for placement at a special-education day school, though it specified no particular location.

Ultimately unable to find a special-education day school willing to accept B.D., DCPS issued an amended IEP that included placement at a residential facility. *See* October 2012 IEP. DCPS subsequently offered B.D. a placement at Eagleton School, a residential treatment facility, which the Davises declined because they believed it would not meet B.D.'s needs. Although the Davises are challenging this amended IEP in a separate proceeding, they "accept, solely for purposes of this appeal," that both it and the proposed residential placement "were appropriate for B.D." Appellants' Br. 24 n.7.

The Davises filed a complaint in United States district court, which, as amended, contained four causes of action. In count one, the Davises appealed unfavorable portions of the Hearing Officer's Decision, especially the refusal to provide more compensatory education. In count two, they sought to enforce favorable portions of the Hearing Officer's Decision, which they alleged DCPS had violated in a number of ways, including by "failing to fully reimburse [them]" for the tutoring and occupational therapy they provided before the Hearing Officer's Decision. In count three, they sought an

injunction requiring the District "to find an appropriate therapeutic residential placement for B.D. and to work with that facility to develop appropriate educational and treatment programs for him without further delay" or, "[a]lternatively, . . . to provide all services B.D. needs while he awaits completion of an appropriate IEP and a proper educational and therapeutic placement." Second Am. Compl. ¶¶ 74–75. And in count four, the Davises requested legal fees and expenses as partially prevailing parties at the administrative level. The parties filed cross-motions for summary judgment, which the district court granted in favor of the District on the first three counts and in favor of the Davises on the fourth. *B.D. v. District of Columbia*, 75 F. Supp. 3d 225 (D.D.C. 2014).

The Davises now appeal the district court's judgment on each of the first three counts.

## II.

The Davises first argue that the Hearing Officer's Decision, affirmed by the district court, failed to award sufficient compensatory education. Because the district court based its ruling on this count entirely on the administrative record, our review is de novo. *Reid*, 401 F.3d at 522. Accordingly, we apply the same standard of review the district court did in evaluating the Hearing Officer's Decision, namely, assessing whether the appealing party has "persuad[ed] the court that the hearing officer was wrong." *Id.* at 521 (internal quotation marks omitted). This standard is "less deferen[tial] than is conventional in administrative proceedings," and we give "little deference" to "a hearing decision without reasoned and specific findings." *Id.* (internal quotation marks omitted).

When a hearing officer or district court concludes that a school district has failed to provide a student with a FAPE, it has "broad discretion to fashion an appropriate remedy," which can go beyond prospectively providing a FAPE, and can include compensatory education. *Boose v. District of Columbia*, 786 F.3d 1054, 1056 (D.C. Cir. 2015) (internal quotation marks omitted). As we held in *Reid ex rel. Reid v. District of Columbia*, an award of compensatory education "must be reasonably calculated to provide the educational benefits that likely would have accrued from special education services the school district should have supplied in the first place." 401 F.3d at 524. In other words, compensatory education aims to put a student like B.D. in the position he would be in absent the FAPE denial.

An appropriate compensatory education award must "rely on individualized assessments," and the equitable and flexible nature of the remedy "will produce different results in different cases depending on the child's needs." *Id.* In some cases, the award may consist of "only short, intensive compensatory programs targeted at specific problems or deficiencies," while in others the student may require "extended programs, perhaps even exceeding hour-for-hour replacement of time spent without FAPE." *Id.* To fully compensate a student, the award must seek not only to undo the FAPE denial's affirmative harm, but also to compensate for lost progress that the student would have made.

An example might be helpful. Imagine a student who with the benefit of a FAPE would have learned to add in month one, multiply in month two, and divide in month three. If the school system denies her a FAPE in month two in a way that not only prevents her from learning to multiply, but also causes her to lose the ability to add, a proper compensatory education award would both reteach addition and teach

multiplication. Moreover, if the award did not issue until the end of month three, during which the school system had resumed providing a FAPE and taught the student how to add and multiply, but not divide, a compensatory education award aimed at teaching the student to divide would be required, as that would be the only way to put the student in the position she would be in absent the FAPE denial.

In this case, the Hearing Officer began by stating the correct standard—that compensatory education should "provide the educational benefits that likely would have accrued from special education services the school district should have supplied in the first place." HOD at 24 (citing *Reid*, 401 F.3d at 524). Applying that standard, the Hearing Officer determined that five hours of occupational therapy per week for three months appropriately compensated B.D. for one harm he suffered as a result of his FAPE denial—namely, the negative behaviors that manifested or worsened while he attended the Katherine Thomas School. As mentioned above, however, the Hearing Officer declined to award any additional compensatory education.

In our view, the Hearing Officer's determination was inconsistent with proper application of the *Reid* standard. The record before the Hearing Officer demonstrated that the FAPE denial caused B.D. not only to learn or relearn negative behaviors, but also to fail to make meaningful educational progress during the FAPE denial period. The report submitted by the Katherine Thomas School makes clear that B.D. made little if any progress while there. *See* Katherine Thomas School Report at 3 (noting that B.D. participated in only 27% of academic class time). True, the Davises provided some tutoring and occupational therapy at their own expense between the time of B.D.'s departure from Katherine Thomas and the Hearing Officer's Decision. But even so, they were

unable to afford all of the services that B.D.'s IEP—prepared by DCPS during this time period—called for, including psychological counseling and more tutoring. Hearing Tr. at 65–71 (Feb. 29, 2012). It makes little sense to think that the absence of these services left B.D. no worse off than he would have been had the District provided them.

Of course, compensatory education awards require a "flexible approach" tailored to the facts of each case, and, as we made clear in *Reid*, a mechanical award of services identical to those wrongly denied is inappropriate. *Reid*, 401 F.3d at 524. Nonetheless, in the unique circumstances of this case, where the record so strongly indicates that the FAPE denial prevented B.D. from making educational progress, the Hearing Officer had an obligation either to fashion a compensatory education program to redress that harm or to provide an adequate explanation for his decision not to do so. To return to our math example, the Hearing Officer's award was equivalent to reteaching addition, but failing to teach either multiplication or division.

Without much explanation, the Hearing Officer concluded that nothing in the record indicated how certain other services "might meet the *Reid* standard" and, for reasons inapplicable to an award of compensatory education, rejected a temporary placement at Meridell. HOD at 26–29. Critically, however, the Hearing Officer failed to address the broader question of how to put B.D. in the educational position he would be in but for the FAPE denial. The Decision's lack of reasoned explanation for its implicit conclusion that B.D. was only minimally harmed by the FAPE denial means that we owe it "little deference." *Reid*, 401 F.3d at 521.

We recognize, of course, the difficulty inherent in figuring out both what position a student would be in absent a

12

FAPE denial and how to get the student to that position. We also understand that B.D.'s out-of-date and incomplete assessments exacerbated these difficulties. Indeed, the Hearing Officer agreed that new assessments were "necessary to determine an appropriate educational program for [B.D.]." HOD at 29. But, contrary to the District's suggestion that the Hearing Officer viewed these assessments as precursors to a more extensive compensatory education award, *see* Appellee's Br. 28–29, the Hearing Officer actually appeared to see them as informing only the measures that DCPS would have to take to prospectively provide a FAPE. Nothing in the Hearing Officer's Decision required updating or supplementing the compensatory education award upon completion of the new assessments. *See* HOD at 31.

Accordingly, the Davises have met their burden of demonstrating that the Hearing Officer, affirmed by the district court, was "wrong," *see Reid*, 401 F.3d at 521, as he failed to award sufficient compensatory education to put B.D. in the position he would be in absent the FAPE denial. We shall thus reverse the district court's grant of summary judgment to the District on this count. On remand, the ultimate goal will be not merely to restore B.D. to the position he was in prior to the FAPE denial in August 2011, nor even merely to put him where he would have been in March 2012, the end of the FAPE denial period at issue here. Rather, the district court must either fashion a compensatory education award that seeks to put B.D. in the educational position he would be in at the time of the new award had the District not denied him a FAPE from August 2011 to March 2012 or remand to the Hearing Officer with instructions to do so. *See id.* at 526 (indicating that on remand, the district could either "fashion an appropriate compensatory remedy" or "determine that the 'appropriate' relief is a remand to the hearing officer for further proceedings").

In carrying out the complicated work of fashioning such a remedy, the district court or Hearing Officer should pay close attention to the question of assessment. Assessments sufficient to discern B.D.'s needs and fashion an appropriate compensatory education program may now exist. But it may also well be that further assessments are needed. If so, the district court or Hearing Officer should not hesitate to order them, including, if appropriate on the updated record, assessment at a residential treatment facility. *Cf. id.* at 522 (explaining that compensatory education awards may include services that would not ordinarily be available under IDEA, such as education beyond age 21).

## III.

This brings us to the Davises' effort to enforce the favorable portions of the Hearing Officer's Decision. Among other things, the Davises complain that the District failed, contrary to the Hearing Officer's order, to reimburse them for all of the tutoring and occupational therapy they provided for B.D. prior to the decision. The District contends that the Davises have failed to point to any statutory basis for an enforcement cause of action. The Davises insist that several such statutory bases exist, but they have forfeited two of them: (1) that 42 U.S.C. § 1983 provides an enforcement cause of action, *see also* Amicus Br. 19–23 (making the same argument), and (2) that an enforcement cause of action may be implied from IDEA as a whole. Indeed, because the Davises presented these arguments neither to the district court nor to this court in their opening brief, they have forfeited them twice over. *American Institute of Certified Public Accountants v. IRS*, 804 F.3d 1193, 1199 (D.C. Cir. 2015) (failure to present argument to district court); *American Wildlands v. Kempthorne*, 530 F.3d 991, 1001 (D.C. Cir. 2008) (failure to present argument in opening brief); *see also Narragansett Indian Tribe v. National Indian Gaming*

*Commission*, 158 F.3d 1335, 1338 (D.C. Cir. 1998) (declining to consider an argument raised only in an amicus brief). We thus reserve the question of their validity for a later case.

We turn, then, to the Davises' primary preserved argument: that a particular provision of IDEA—20 U.S.C. § 1415(i)(2)(a)—provides a cause of action to enforce a favorable hearing officer decision. That provision grants "[a]ny party aggrieved by the findings and decision" of a hearing officer "the right to bring a civil action . . . in any State court of competent jurisdiction or in a district court of the United States, without regard to the amount in controversy." Since 2004, IDEA has also included a limitations provision for actions brought under section 1415(i)(2)(A). Specifically, "[t]he party bringing the action shall have 90 days from the date of the decision of the hearing officer to bring such an action, or, if the State has an explicit time limitation for bringing such action . . . , in such time as the State law allows." *Id.* § 1415(i)(2)(B).

The District has a very different view of section 1415(i)(2)(A). Focusing first on the statute's plain text, the District argues that a plaintiff trying to enforce a hearing officer's decision cannot be said to be "aggrieved by the findings and decision." The District also points out that the statute of limitations runs from the time of the hearing officer's decision, which suggests that the cause of action was intended to reach defects only in the decision itself, not in its implementation.

The Davises and amici contend that the District's reading of section 1415(i)(2)(A) would undermine IDEA's purpose of ensuring a FAPE for all students. In particular, they argue that the District's interpretation would produce an anomalous result: families that lose in administrative proceedings could

obtain judicial review and court enforcement of any resulting court order under the court's inherent power to enforce its decisions, but families that win before a hearing officer could not.

Both sides find some support in the case law. The District points to *Robinson v. Pinderhughes*, 810 F.2d 1270, 1275 (4th Cir. 1987), in which the Fourth Circuit held that a party seeking to enforce a hearing officer's decision was not aggrieved by that decision and thus could not bring a claim under an identically worded predecessor of section 1415(i)(2)(A), although it did permit the enforcement action to go forward under an alternative theory. This Court, moreover, has twice suggested in dicta that parties seeking enforcement cannot proceed under section 1415(i)(2)(A) or its predecessor because they are not "aggrieved by the findings and decision." *Blackman v. District of Columbia*, 456 F.3d 167, 172 n.6 (D.C. Cir. 2006) ("Because the appellees were either 'prevailing parties' at the administrative level or had reached private agreements with the DCPS, they had no IDEA cause of action. *See* 20 U.S.C. § 1415(i)(2) (limiting IDEA cause of action to '[a]ny party aggrieved . . . .')"); *Moore v. District of Columbia*, 886 F.2d 335, 337 (D.C. Cir. 1989) ("None of the appellees was a 'party aggrieved' by the administrative decision in these cases, since all the appellees prevailed in those proceedings." (citing *Pinderhughes*)), *vacated on other grounds*, 907 F.2d 165 (D.C. Cir. 1990) (en banc).

For their part, the Davises point to more recent circuit court decisions that allowed enforcement claims to proceed under section 1415(i)(2)(A). Most notably, the First Circuit so held in *Nieves-Márquez v. Puerto Rico*, 353 F.3d 108, 115–17 (1st Cir. 2003), as did the Third Circuit in *D.E. v. Central Dauphin School District*, 765 F.3d 260, 276–78 (3d Cir.

2014). Both relied heavily on purpose arguments similar to those the Davises offer here. Moreover, other circuit courts have taken a similar approach in dicta or in cases where the question was not squarely presented. *E.g.*, *Porter v. Board of Trustees of Manhattan Beach Unified School District*, 307 F.3d 1064, 1069 n.7 (9th Cir. 2002) ("Nor do the parties dispute that the IDEA's right of action provides a proper means to enforce a due process hearing order . . . .").

The purpose arguments that the Davises and amici advance and that the First and Third Circuits accepted have some real force. Nonetheless, the statutory text and structure persuade us that section 1415(i)(2)(A) provides no enforcement cause of action. *See Hartford Underwriters Insurance Co. v. Union Planters Bank, N.A.*, 530 U.S. 1, 6 (2000) ("[W]hen the statute's language is plain, the sole function of the courts—at least where the disposition required by the text is not absurd—is to enforce it according to its terms." (internal quotation marks omitted)). Section 1415(i)(2)(A)'s plain text refers not simply to an "aggrieved" party, but to one aggrieved "by the findings and decision" of a hearing officer. 20 U.S.C. § 1415(i)(2)(A). One who wins before a hearing officer is not "aggrieved" by the hearing officer's decision.

The statute of limitations confirms this reading, as the limitations period runs from the issuance of the hearing officer's decision, not from the moment of noncompliance. This is especially telling because such decisions often require more than ninety days to implement. And even when noncompliance occurs within ninety days, it may well take some time to discover. Given this, we doubt very much that Congress intended section 1415(i)(2)(A) to provide an enforcement cause of action. Odd as it may seem for the statute to lack such a cause of action, it would be even odder

for Congress to have created one but limited it to violations of hearing officer decisions that both occur and are discovered within ninety days. Although the District made this precise point in its brief, the Davises failed to respond in theirs. Asked about the issue at oral argument, counsel for the Davises recognized that "compliance might or might not occur within . . . ninety days," but contended that this means that the statute of limitations simply does not apply to enforcement suits. Oral Arg. Rec. 5:01–5:24. The statute of limitations, however, applies to "[t]he party bringing the action," with no indication that different kinds of actions are treated differently. 20 U.S.C. § 1415(i)(2)(B).

Notably, moreover, IDEA did not contain this statute of limitations when the First Circuit held that parties seeking enforcement were "aggrieved by the findings and decision." *See Nieves-Márquez*, 353 F.3d at 115–17. Nor did the Third Circuit consider the statute of limitations when it followed the First Circuit's lead. *See D.E.*, 765 F.3d at 276–78.

The Davises criticize the District's plain meaning argument as inconsistent with the principle expressed in *King v. Burwell* that courts should not interpret statutes "to negate their own stated purpose." 135 S. Ct. 2480, 2493 (2015) (internal quotation marks omitted). But in *King*, the Supreme Court looked to the "broader structure of the Act" only "[a]fter reading [the relevant language] along with other related provisions" and finding "that the text is ambiguous." *Id.* at 2492. Here, as noted above, far from making the text ambiguous, the most related provision—the statute of limitations—only reinforces its plain meaning.

Moreover, we are unconvinced that our conclusion that section 1415(i)(2)(A) provides no enforcement cause of action necessarily leaves families like the Davises without a

viable route to relief in federal court. Indeed, although the argument that section 1983 provides an enforcement cause of action is forfeited in this case, some courts have accepted it, *compare, e.g.*, *Mrs. W. v. Tirozzi*, 832 F.2d 748, 755 (2d Cir. 1987) (accepting the theory), *with, e.g.*, *A.W. v. Jersey City Public Schools*, 486 F.3d 791, 803 (3d Cir. 2007) (en banc) (rejecting it), and its viability remains an open question in this circuit, *see Blackman*, 456 F.3d at 172 n.6 (reserving the question and "assum[ing], without deciding, that [such] section 1983 actions are cognizable"). Likewise, we are aware of no decision specifically foreclosing an IDEA enforcement suit premised on an implied cause of action.

The Davises' second preserved argument requires much less attention. They claim that the general federal question jurisdiction statute, 28 U.S.C. § 1331, gives the district court jurisdiction over their enforcement suit. That is true as far as it goes, as the District concedes. The problem with the Davises' suit, however, is not a lack of jurisdiction. Rather, it is that they have failed to identify a cause of action, a problem this jurisdictional statute in no way helps them solve.

We thus hold that neither section 1415(i)(2)(A) nor section 1331 provides a cause of action for parents seeking to enforce a favorable hearing officer decision. We leave for another day the viability of the alternative bases for such a cause of action.

## IV.

Finally, the Davises challenge the district court's judgment for the District on count three of their second amended complaint. This count, which the Davises labeled "Injunction," requested an order requiring the District "to find an appropriate therapeutic residential placement for B.D. and to work with that facility to develop appropriate educational

and treatment programs for him without further delay" or, "[a]lternatively, . . . to provide all services B.D. needs while he awaits completion of an appropriate IEP and a proper educational and therapeutic placement." Second Am. Compl. ¶¶ 74–75. The district court reasoned that this count became moot because "B.D. has an updated and appropriate IEP that was completed in October 2012, recommending that he be educated in a therapeutic residential facility" and "the District has located an appropriate therapeutic residential facility that has accepted B.D. and is capable of implementing his current IEP." *B.D.*, 75 F. Supp. 3d at 231–32. And indeed, the Davises have "accept[ed], solely for purposes of this appeal, the district court's comment that both the October 2012 IEP and the April 4, 2014 acceptance by a residential school (the Eagleton School) were appropriate for B.D." Appellants' Br. 24 n.7.

The Davises insist that despite these concessions, count three remains live because it should be read together with count two, which seeks compliance with the Hearing Officer's Decision more generally. As the Davises correctly point out, in summarizing the relief they sought, the district court grouped those two counts together. *B.D.*, 75 F. Supp. 3d at 229. But in finding that count three had become moot, the district court neither foreclosed relief under count two (which, as discussed above, failed for the independent reason that the Davises advanced no viable enforcement cause of action), nor spoke to compensatory education more broadly. Rather, it merely held that the request for an injunction—the only relief count three specifically sought—had become moot. Because this is correct, we shall affirm the district court's judgment on count three.

**V.**

For the foregoing reasons, we reverse the district court's grant of summary judgment to the District on count one and remand for either the district court or Hearing Officer to fashion a compensatory education award aimed at putting B.D. in the educational position he would be in had the District provided him a FAPE from August 2011 to March 2012. We affirm the district court's judgment for the District on counts two and three.

*So ordered.*

MILLETT, *Circuit Judge*, concurring: I join Judge Tatel's opinion for the Court in full, including the holding that 20 U.S.C. § 1415(i)(2)(A) does not provide a cause of action to enforce school district compliance with a hearing officer's decision. As the opinion explains, the Davises are aggrieved by the District's actions, not any "findings [or] decision" by the Hearing Officer, *id*.

The opinion notes that refusing to recognize an atextual cause of action under Section 1415(i)(2)(A) may not leave parents without a route to relief when school districts fail to adhere to hearing officer decisions because there might be a cause of action under 42 U.S.C. § 1983, or perhaps even an implied cause of action under the IDEA itself. *See* Slip Op. 18. I write only to note that the United States Department of Education, which has responsibility for the federal administration and enforcement of the IDEA, *see* 20 U.S.C. § 1412(d), 1416(a), 1406(d)–(f), has identified a third possible avenue for enforcing a hearing officer's decision. *See* Brief for the United States as Amicus Curiae 13–14, *Porter v. Board of Trustees of Manhattan Beach Unified School District*, 307 F.3d 1064 (9th Cir. 2002) (No. 01-55032). Under the IDEA, any "matter relating to the identification, evaluation, or educational placement of the child, or the provision of a free appropriate public education to such child" can be the basis of a due process complaint and hearing. *See* 20 U.S.C. § 1415(b)(6) & (f)(1). In the federal government's view, a school district's failure to comply with a hearing officer's decision is such a matter. Thus, according to the Department of Education, parents facing a lack of compliance might be able to bring another due process complaint to enforce the prior decision and, if necessary, seek judicial review of any denial of needed relief in that proceeding.